No. 19-2091

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

ESTEBAN ALFARO-HUITRON, *et al.*,
Appellants

v.

CERVANTES AGRIBUSINESS, *et al.*,
Appellees.

_____

Appeal from the United States District Court
For the District of New Mexico, Civil No. 2:15-210
Before The Honorable Judith C. Herrera

_____

**BRIEF FOR ALL APPELLANTS—
ESTEBAN ALFARO-HUITRON, ELEAZAR GARCIA-MATA, JOSE
ANTONIO GARCIA-MATA, JUAN GUZMAN, ENRIQUE ROJAS-
TORRES, LAZARO ROJAS-TORRES, RAUL JASSO-CERDA,
TRINIDAD SANTOYO-GARCIA, AND BERTHA MARTINEZ**

_____

Jerome Wesevich
Chris Benoit
TEXAS RIOGRANDE LEGAL AID
1331 Texas Avenue
El Paso, Texas  79901
(915) 585-5120
*Attorneys for Appellants*

**Oral Argument Requested**
Filed October 4, 2019

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ................................................................ iii

GLOSSARY ...................................................................................... ix

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE .............................................................. 2

    A.   Statutory and Regulatory Background. ..................................... 2

    B.   Statement of Facts .................................................................. 8

         1.   Pre-WKI Farm Labor Opportunities in Southern New Mexico ....... 8

         2.   Jaime Campos Founds WKI ............................................... 9

         3.   WKI Contracts With Growers Including CABEI ........................... 12

         4.   WKI Files an H-2A Application and Hires the Farmworkers ........ 14

         5.   WKI Falsely Blames Drought for Canceling Contracts ................ 16

    C.   Proceedings Below .............................................................. 18

SUMMARY OF THE ARGUMENT .................................................... 20

STANDARD OF REVIEW ............................................................... 23

ARGUMENT ................................................................................. 24

    I.   The district court erred by holding that independent contractors cannot be agents. ................................................................ 24

    II.   The summary judgment record shows a triable fact issue as to whether WKI acted as CABEI's non-servant agent in contracting with the Farmworkers. ...................................................................... 29

i

      A.   Independent contractors acting within the scope of their authority are agents who can bind principals to authorized transactions. ....29

      B.   The record shows a genuine dispute as to whether WKI acted as CABEI's non-servant agent............................................................31

III.   The summary judgment record shows a triable fact issue as to whether CABEI jointly employed the Farmworkers under AWPA..................37

      A.   AWPA joint employment is broadly defined. ................................38

      B.   The record shows a genuine dispute on the issue of joint employment. ..................................................................................41

IV.   The district court erred by granting summary judgment on three issues without ever considering any relevant evidence...................45

      A. The district court failed to consider the evidence of Jaime Campos's wrongful acts as the predicate for the Farmworkers' civil conspiracy claim against CABEI.....................46

      B. The district court granted CABEI's second motion for partial summary judgment without mentioning its merits. ..........................48

CONCLUSION ...................................................................................49

ORAL ARGUMENT REQUEST ..........................................................49

CERTIFICATES OF SERVICE/DIGITAL SUBMISSION/COMPLIANCE........50

Attachment 1: First Order Appealed.............................Reprinted Appendix 687-723

Attachment 2: Second Order Appealed ........................Reprinted Appendix 963-981

Attachment 3: Final Judgment .............................................Reprinted Appendix 982

# TABLE OF AUTHORITIES

Page(s)

Cases

2004-NMSC-005, 135 N.M. 115, 85 P.3d 239 ...................................................... 25

*Allstate Ins. v. Ford Motor Credit Co.*,
   2006 WL 8444504 (D.N.M. Feb. 24, 2006) .................................................. 29, 30

*Antenor v. D & S Farms*,
   88 F.3d 925 (11th Cir. 1996) .......................................................... 22, 38, 39, 41

*Appleby v. Kewanee Oil Co.*,
   279 F.2d 334 (10th Cir. 1960) .............................................................. 30

*Archuleta v. Pina*,
   1974-NMSC-021, 86 N.M. 94, 519 P.2d 1175 .................................................. 27

*Barron v. Evangelical Lutheran Good Samaritan Soc.*,
   2011-NMCA-094, 150 N.M. 669, 265 P.3d 720 ................................................. 29

*Beliz v. W.H. McLeod & Sons Packing Co.*,
   765 F.2d 1317 (5th Cir. 1985) .......................................................... 32, 44

*Benavidez v. Sierra Blanca Motors*,
   1998-NMCA-070, 125 N.M. 235, 959 P.2d 569 (collecting cases) ............... 33, 34

*Caro-Galvan v. Curtis Richardson, Inc.*,
   993 F.2d 1500 (11th Cir. 1993) ............................................................ 39

*Casares v. Agri-Placements Int'l, Inc.*,
   12 F. Supp. 3d 956 (S.D. Tex. 2014) ...................................................... 7

*Castillo v. Case Farms of Ohio, Inc.*,
   96 F. Supp. 2d 578 (W.D. Tex. 1999) ...................................................... 39

*Cheney v. Hailey*,
   686 P.2d 808 (Colo. App. 1984) ............................................................ 26

*Ditty v. CheckRite, Ltd., Inc.*,
    973 F. Supp. 1320 (D. Utah 1997) ....................................................... 26

*EEOC v. Horizon/CMS Healthcare Corp.*,
    220 F.3d 1184 (10th Cir. 2000) .......................................................... 24

*Elisberg v. Presbyterian Healthcare Servs., Inc.*,
    2006 WL 8443756 (D.N.M. Aug. 10, 2006) ....................................... 26

*Estate of Anderson v. Denny's, Inc.*,
    987 F. Supp. 2d 1113 (D.N.M. 2013) .................................................. 33

*Ettenson v. Burke*,
    2001-NMCA-003, 130 N.M. 67, 17 P.3d 440 ..................................... 46

*Fanette v. Steven Davis Farms, LLC*,
    28 F. Supp. 3d 1243 (N.D. Fla. 2014) ................................ 40, 42, 43, 44

*Fassbender v. Correct Care Sols., LLC*,
    890 F.3d 875 (10th Cir. 2018) ...................................................... 17, 24

*First Nat. Bank and Trust Co. v. Sidwell Corp.*,
    678 P.2d 118 (Kan. 1984) ................................................................... 26

*Fisher v. Shamburg*,
    624 F.2d 156 (10th Cir. 1980) ............................................................ 47

*Gallegos v. Citizens Ins. Agency*,
    1989-NMSC-055, 108 N.M. 722, 779 P.2d 99 .................................... 33

*Garcia-Celestino v. Ruiz Harvesting, Inc.*,
    843 F.3d 1276 (11th Cir. 2016) ................................................. 5, 6, 40

*Grease Monkey Int'l v. Montoya*,
    904 P.2d 468 (Colo. 1995) .................................................................. 27

*Gutierrez v. Cobos*,
    841 F.3d 895 (10th Cir. 2016) ............................................................ 24

*Harger v. Structural Servs., Inc.*,
   1996-NMSC-018, 121 N.M. 657, 916 P.2d 1324 ................................................ 26

*Jaramillo v. Thomas*,
   1965-NMSC-156, 75 N.M. 612, 409 P.2d 131 .................................................. 27

*Logue v. United States*,
   412 U.S. 521 (1973)............................................................................................ 26

*Maxwell v. St. Francis Health Ctr.*,
   2017 WL 4037732 (D. Kan. Sept. 13, 2017)...................................................... 26

*McCarthy v. Recordex Service, Inc.*,
   80 F.3d 842 (3rd Cir. 1996) ............................................................................... 26

*McIncrow v. Harris Cty.*,
   878 F.2d 835 (5th Cir. 1989) ....................................................................... 23, 45

*McKinney v. United States*,
   724 Fed. Appx. 628 (10th Cir. 2018) ................................................................. 27

*N.M. Military Inst. v N.M.M.I. Alumni Ass'n, Inc.*, No. A-1-CA-35621,
   2018 WL 5262677 ............................................................................................. 30

*Nationwide Mut. Ins. Co. v. Darden*,
   503 U.S. 318 (1992)............................................................................................ 38

*Phelps v. State Farm Mut. Auto. Ins. Co.*,
   736 F.3d 697 (6th Cir. 2012) ............................................................................. 45

*Posadas de Puerto Rico Associates, Inc. v. Sec'y of Labor of U.S.*,
   698 F. Supp. 396 (D.P.R. 1988) ........................................................................ 14

*Quigley v. Rosenthal*,
   327 F.3d 1044 (10th Cir. 2003) ......................................................................... 26

*Roberts v. Printup*,
   422 F.3d 1211 (10th Cir.2005) .......................................................................... 23

*Robles v. Consolidated Graphics, Inc.*,
965 S.W.2d 552 (Tex. App.—Houston [14th Dist.] 1997, pet. denied)............... 26

*Rodriguez v. SGLC, Inc.*,
2012 WL 5704403 (E.D. Cal. Nov. 15, 2012) ..................................................... 42

*Romero v. Shelton*,
1962-NMSC-118, 70 N.M. 425, 374 P.2d 301 ............................................. 27, 32

*Salinas v. Commercial Interiors, Inc.*,
848 F.3d 125 (4th Cir. 2017) ...................................................................... 38, 41

*Segura v. Colombe*,
895 F. Supp. 2d 1141 (D.N.M. 2012).................................................................... 37

*Stinnett v. Safeway, Inc.*,
337 F.3d 1213 (10th Cir. 2003) .................................................................. 36, 37

*Torres-Lopez v. May*,
111 F.3d 633 (9th Cir. 1997) ............................................................................... 39

*Wiggs v. City of Phoenix*,
10 P.3d 625 (Ariz. 2000) ...................................................................................... 26

Statutes

8 U.S.C. § 1101(a)(15)(H)(ii)(a).............................................................................. 2

8 U.S.C. § 1184(c) ................................................................................................... 3

8 U.S.C. § 1188...................................................................................................... 3, 6

8 U.S.C. § 1188(c)(3)(A)(ii) ................................................................................... 6

28 U.S.C. § 1291 ..................................................................................................... 2

28 U.S.C. §§ 1331 ................................................................................................... 1

29 U.S.C. § 203(g) ................................................................................................. 38

29 U.S.C. § 206(a)(1) ................................................................ 5

29 U.S.C. § 1801 ...................................................................... 3

29 U.S.C. § 1802(5) ............................................................... 38

29 U.S.C. §§ 1802(8)(B)(ii) and (10)(b)(iii) ............................. 4

29 U.S.C. § 1822(c) .......................................................... 18, 37

29 U.S.C. § 1854 ...................................................................... 1

N.M. STAT. ANN. § 50-4-22(a) .................................................. 5


Rules

10th Cir. Rule 30.1 ................................................................... 1

Fed. R. Civ. P. 56(a) ............................................... 23, 24, 45, 48


Regulations

8 C.F.R. § 214.2(h)(2)(i) .......................................................... 6

20 C.F.R. Part 655 ................................................................... 4

20 C.F.R. § 122(a) ................................................................... 6

20 C.F.R. § 655.100 .............................................................. 3, 5

20 C.F.R. § 655.103(b) ......................................................... 7, 8

20 C.F.R. § 655.105 ................................................................. 4

20 C.F.R. § 655.120 ................................................................. 5

20 C.F.R. §§ 655.121 ............................................................... 3

20 C.F.R. § 655.122 .............................................. 3, 4, 5, 6, 16

20 C.F.R. § 655.132(a) ................................................................ 7

20 C.F.R. § 655.132(a)-(b)(4) ................................................ 11, 13

20 C.F.R. § 655.132(b) ............................................................... 7

20 C.F.R. § 655.132(b)(4) ........................................... 21, 32, 33, 35

20 C.F.R. § 655.135(e) ............................................................... 4

20 C.F.R. § 655.135(k) ............................................................. 44

20 C.F.R. § 655.156(a) ............................................................... 6

29 C.F.R. § 500.20(h) ................................................... 22, 40, 41

29 C.F.R. § 791.2(a) ................................................................ 40

Other Authorities

Restatement (Second) of Agency § 1(1) ................................ 25, 32

Restatement (Second) of Agency § 2 ............................... 20, 25, 26

Restatement (Second) of Agency § 14 ................................... 30, 31

Restatement (Second) of Agency § 14N ........................ 20, 26, 29

Restatement (Second) of Agency § 50 ....................................... 28

Restatement (Second) of Agency § 220 ................................. 25, 38

Restatement (Third) of Agency Ch. 2 ........................................ 25

Restatement (Third) of Agency § 1.01 ....................................... 27

## STATEMENT OF PRIOR OR RELATED APPEALS

No prior or related appeals exist.

# GLOSSARY

| | |
|---|---|
| AEWR | Adverse Effect Wage Rate Defined in 20 C.F.R. § 655.100(c) |
| APX | Appendix filed by Appellants Oct. 4, 2019, 4 Volumes, pp. 001-984 |
| AWPA | Agricultural Worker Protection Act, 29 U.S.C. § 1801, *et seq.* |
| CAB | Appellee Cervantes Agribusiness |
| CEI | Appellee Cervantes Enterprises, Inc. |
| CABEI | CAB and CEI |
| DOL | U.S. Department of Labor |
| FLSA | Fair Labor Standards Act |
| H-2A | Foreign Guestworker Program Under 8 U.S.C. § 1101(a)(15)(H)(ii)(a) |
| H-2ALC | H-2A Labor Contractor Defined in 20 C.F.R. §§ 655.103(b) and 132 |
| USCIS | U.S. Citizen and Immigration Services |
| WKI | WKI Outsourcing Solutions, Inc. |

Appellants are nine U.S. citizens and permanent residents who perform farm labor ("Farmworkers"). They allege that Appellees Cervantes Agribusiness ("CAB") and Cervantes Enterprises, Inc. ("CEI") contracted with WKI Outsourcing Solutions ("WKI") to recruit farm laborers under the federal "H-2A" foreign guestworker statute and regulations. After WKI hired the Farmworkers for specific dates, hours, and wages, CAB and CEI (collectively "CABEI") did not provide any work to the Farmworkers. The district court dismissed all claims against CABEI on summary judgment, holding that CABEI could not be held liable for any breach of WKI's contract with the Farmworkers because no agency relationship existed between CABEI and WKI, and no joint-employment relationship existed between CABEI and WKI. The Farmworkers appeal because the district court's summary judgment is premised on manifest errors of law, and because the record contains evidence of agency and joint employment that is sufficient to require a trial.

## STATEMENT OF JURISDICTION

The Farmworkers invoked the district court's jurisdiction under 29 U.S.C. § 1854 (agricultural worker protection), and 28 U.S.C. §§ 1331 (federal question), 1337 (interstate commerce), and 1367 (supplemental). APX 31 (Complaint).[1] The

---

[1] Record cites are to "APX" which is the consecutively paginated Appendix filed with this brief pursuant to 10th Cir. Rule 30.1, followed by a parenthetical describing the document with line numbers when citing depositions.

district court entered Rule 56 summary judgment dismissing all claims against

Cervantes Agribusiness and Cervantes Enterprises, Inc.  APX 687 (Order, Jan. 22,

2018); APX 963 (Order, Sept. 28, 2018).  After all remaining parties settled, the

district court entered final judgment on May 6, 2019.  APX 982 (Final Judgment).

The Farmworkers timely appealed on June 5, 2019.  APX 983 (Notice of Appeal).

This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred by holding that WKI could not be an agent
   of CABEI for purposes of hiring workers because WKI was an independent
   contractor.

2. Whether the district court improperly resolved genuine disputes of fact
   shown by the summary judgment record regarding WKI's agency
   relationship to CABEI, and WKI's joint-employer relationship to CABEI.

3. Whether the district court erred by granting summary judgment without any
   mention of evidence as to civil conspiracy, abandonment, and damages.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

The Immigration and Nationality Act establishes numerous visa categories

including one, designated "H-2A," for foreign workers coming temporarily to the

United States to perform agricultural labor.  8 U.S.C. § 1101(a)(15)(H)(ii)(a).  An

employer facing a shortage of U.S. workers may petition the U.S. Department of

Homeland Security for H-2A visas that it may then use to hire foreign labor.  8

U.S.C. § 1184(c).  Before filing a petition with DHS, the employer must first

obtain a temporary labor certification from the U.S. Department of Labor ("DOL")

by showing that: (a) U.S. workers are not available to fill the employer's jobs; and

(b) importation of foreign workers will not adversely affect the wages and working

conditions of similarly employed U.S. workers.  8 U.S.C. §1188(a).  These two

conditions assure U.S. workers that they will be given job preference over foreign

workers and that foreign workers, if admitted, will not depress local wages and

working conditions.  20 C.F.R. §§ 655.100 and 655.120.  These conditions also

protect U.S. employers from unfair competition by businesses that exploit foreign

labor.  *See* 29 U.S.C. § 1801.

To begin seeking foreign labor, employers must submit two forms to DOL,

Form ETA-9142 ("Application for Temporary Employment Certification") and

Form ETA-790, commonly called a "clearance order."   20 C.F.R. §§ 655.121 and

655.130.  These two documents require the employer to specifically describe the

job to be filled, the number of available openings, the duties of workers performing

the job, the job site(s) where the work will be performed, and the wages and other

terms of work being offered.  20 C.F.R. §§ 655.103, 122, and 150.  H-2A clearance

orders must include written assurance that employers will comply with all federal

laws, including the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"). 20 C.F.R. § 655.135(e).[2] As a matter of law, the terms of each contract between each H-2A employer and worker, whether U.S. or foreign, consist of the clearance order combined with H-2A regulations. 20 C.F.R. § 655.122(q).[3]

The employer's offered terms of work on a clearance order must meet or exceed the minimum terms of work that DOL's Employment Training Administration has determined are necessary to avoid an adverse effect on U.S. wages and working conditions. 20 C.F.R. Part 655. Among other things, these minimum work terms require employers to offer the highest of the adverse effect wage rate, the prevailing hourly or piece rate, or the federal or state minimum wage, and to agree to comply with all federal, state and local employment related laws. *See* 20 C.F.R. §§ 655.104(*l*), 655.105(e) and 655.105(g).

The adverse effect wage rate ("AEWR") is a minimum hourly rate set by DOL on a state-by-state basis that is designed to ensure that foreign workers

---

[2] AWPA covers U.S. workers, and does not apply to foreign guestworkers. 29 U.S.C. §§ 1802(8)(B)(ii) and (10)(b)(iii).

[3] To file Form ETA-9142, each employer must sign a declaration under "penalty of perjury" stating "that I have read and reviewed this application and that to the best of my knowledge the information contained therein is true and accurate," and any attempt "to aid, abet, or counsel" anyone in submitting any false information in this application is a felony. 20 C.F.R. § 655.103.

agricultural workers do not undercut domestic wages.  20 C.F.R. § 655.100(c).

Relevant here, the AEWR for New Mexico was $9.71 per hour in 2010, $9.60 per

hour in 2011, and $9.94 per hour in 2012.  *See* 20 C.F.R. §§ 655.120(c) and 122(a);

https://www.foreignlaborcert.doleta.gov/pdf/historical_aewr_2007-2013.pdf.  For

all relevant times the New Mexico minimum wage was $7.50 per hour, and the

federal minimum was $7.25 per hour.  29 U.S.C. § 206(a)(1); N.M. STAT. ANN. §

50-4-22(a).  The purpose of H-2A's wage requirement is to "ensure that foreign

workers will not appear more attractive to the employer than domestic workers,

thus avoiding any adverse effects for domestic workers."  *Garcia-Celestino v. Ruiz

Harvesting, Inc.*, 843 F.3d 1276, 1285 (11th Cir. 2016).

    If DOL determines that the wages and working conditions offered on a

clearance order meet the minimum requirements of its H-2A regulations, it grants

conditional approval of the application.  *See, e.g.,* APX 97 (DOL Conditional

Certification).  At that point, the petitioning employer must begin recruiting U.S.

workers at the approved minimum terms of work in order to determine whether

U.S. workers are available.  DOL provides each conditionally approved clearance

order to the relevant State Workforce Agencies, here the Texas Workforce

Commission and the New Mexico Department of Workforce Solutions.  State

Workforce Agencies assist each H-2A employer in attempting to recruit U.S.

workers to fill the available openings described in each clearance order.  20 C.F.R.

655.103.  During the recruitment period, petitioning employers must hire all willing, qualified, and available U.S. workers.  8 U.S.C. § 1188(c)(3)(A)(ii); 20 C.F.R. §§ 655.122(b). 655.135(c), and 655.156.

State Workforce Agencies investigate as necessary to ensure that H-2A employers hire available U.S. workers.  After DOL communicates with State Workforce Agencies and determines that unfilled positions remain after U.S. workers have been recruited, DOL then certifies to U.S. Citizenship and Immigration Services ("USCIS") that U.S. workers are not available for the remaining job openings and that granting H-2A visas for those openings on the employment terms stated in the clearance order will not adversely affect the wages and working conditions of similarly employed U.S. workers.  If USCIS approves the visas, they are then made available to the employer and the employer then recruits H-2A workers to accept the visas, enter the U.S., and begin work.  8 U.S.C. § 1188(b)(4); 8 C.F.R. § 214.2(h)(2)(i); 20 C.F.R. § 655.156(a).  H-2A visas only permit foreign workers to perform the work described in the single specified H-2A labor certification application, after which the foreign worker must return to the worker's country of origin.  *Id.*; 20 C.F.R. § 122(a).

A petitioning H-2A employer need not be a fixed-situs employer.  DOL regulations allow H-2A labor contractors ("H-2ALCs") to apply for H-2A visas as well.  H-2ALCs are H-2A employers who supply workers to various fixed-site

"employers."  20 C.F.R. § 655.103(b).  An H-2A application filed by an H-2A labor contractor "must be limited to a single area of intended employment in which the fixed-site employer(s) to whom an [H-2A labor contractor] is furnishing employees will be utilizing the employees."  20 C.F.R. § 655.132(a).  H-2A labor contractors must comply with all requirements applicable to H-2A fixed-situs employers, and must also submit to DOL (a) a detailed itinerary listing the anticipated fixed-site employers, dates of work, and type of work; and (b) "fully-executed work contracts with each fixed-site employer" listed on the itinerary. 20 C.F.R. § 655.132(b).

Foreign guestworker programs have long been controversial.  *See, e.g.,* Andorra Bruno, *Immigration of Temporary Lower-Skilled Workers: Current Policy and Related Issues*, Congressional Research Service Report No. R-42434 at 1 (December 13, 2012), available at https://fas.org/sgp/crs/homesec/R42434.pdf. Workers regularly claim that DOL's lax enforcement of regulations exposes U.S. workers to the unfair competition that the statute is supposed to prohibit, and exposes foreign workers to exploitation.  One form of exploitation is when, as alleged here, employers attempt to avoid paying workers the relatively high AWER as compared to minimum wage.  *See, e.g., Casares v. Agri-Placements Int'l, Inc.*, 12 F. Supp. 3d 956, 961 (S.D. Tex. 2014).

**B.    Statement of Facts**

**1.  Pre-WKI Farm Labor Opportunities in Southern New Mexico**

Appellants Esteban Alfaro-Huitron, Eleazar Garcia-Mata, Jose Antonio Garcia-Mata, Juan Guzman, Enrique Rojas-Torres, Lazaro Rojas-Torres, Raul Jasso-Cerda, Trinidad Santoyo-Garcia, and Pedro Tamez (the "Farmworkers") are nine U.S. citizens or lawful permanent residents.  APX 201 (Guzman Depo. at 53:3-7); APX 963 (Order).  Consequently, the Farmworkers are "United States workers" as defined in 20 C.F.R. § 655.103(b).  Most of the Farmworkers have performed agricultural labor for decades on farms throughout the El Paso, Texas and Southern New Mexico region.  APX 614-615 (Alfaro-Huitron Affidavit); APX 616-617 (Eleazar Garcia-Mata Affidavit); APX 618-619 (Jose Garcia-Mata Affidavit); APX 620-621 (Juan Guzman Affidavit).  The Farmworkers are usually paid about the federal minimum wage of $7.25 per hour for performing agricultural labor in this region.  APX 431 (Galvan Depo. at 9:4-9).  But even at minimum wage, the Farmworkers have often found it difficult to secure work, and have naturally sought more work and higher pay.  APX 612-613 (Marentes Declaration ¶¶ 9-10); APX 430-431 (Galvan Depo. at 8:10 to 9:9); APX 438 (Lusinger Depo. at 11:23 to 12:8); APX 257 (Alfaro-Huitron Depo. at 21:9-17).

Historically, Southern New Mexico growers have not accessed foreign H-2A labor.  Instead, they rely upon local workers to perform their seasonal agricultural

labor, and generally pay the New Mexico minimum wage of $7.50 per hour. APX 431 (Galvan Depo. at 12:3-24): APX 447 (Lusinger Depo. at 52:7-15). An abundance of farm laborers, including Farmworkers, reside in the El Paso, Texas area, which keeps wages low. APX 448 (Lusinger Depo. at 54:21 to 55:11); APX 257 (Alfaro-Huitron Depo. at 24:10–19); APX 265 (Juan Guzman Depo. at 12:4–8); APX 431 (Galvan Depo. at 9:6–12:24); APX 442 (Lusinger Depo. at 29:18–30:18); APX 453–55, 459–60 (Maldonado Depo. 17:10–23, 19:15–24:14, 45:21–46:3); APX 573–77 (Exhibit 5, list of "all seasonal workers who worked for" Jesus Maldonado in 2012), APX 459 (Maldonado Depo. 42:9–12)); 612 (Marentes Declaration ¶ 4).

## 2. Jaime Campos Founds WKI

Former defendant Jaime Campos believed that Southern New Mexico growers were dissatisfied with the quality of the U.S. workers who they had been hiring, which led him to incorporate WKI Outsourcing Solutions, Inc. ("WKI") in December 2009. WKI's sole purpose was to import Mexican agricultural laborers under the federal H-2A program. APX 349–51, 357–59 (Campos Depo. at 16:11–21:13); 367 (Campos Depo. at 10:19–25); APX 398–399, 404 (Cervantes Depo. at 19:18 to 23:5 and 43:6–17); APX 420, 422 (Franzoy Depo. at 39:24–41:4, 49:15–17 ("A. Here is what I prefer: I would prefer that all of my help comes from Mexico. . . . . [Q.] That's what you wanted Mr. Campos to do for you, was to get

9

Mexican labor for you; correct? A. Yes."); APX 596 (Answer); APX 604–07

(News Article).  In 2010, Mr. Campos began visiting mayors throughout the

Mexican state of Chihuahua and compiled a list of some two thousand Mexican

nationals who agreed to be drug-tested prior to traveling to the U.S. for H-2A

work.  APX 352 (Campos Depo. At 24:6–25:6); APX 606 (News Article).  On

June 12, 2011, the El Paso Times published a newspaper article describing WKI's

business plan.  Mr. Campos cooperated in preparing this article and swears that the

article accurately describes WKI's singular objective of bringing H-2A workers

into Southern New Mexico.  APX 349–352 (Campos Depo. at 12:13–21, 13:19–

23:4); 604–607 (News Article).

　　　In the summer and fall of 2011, Mr. Campos approached Southern New

Mexico growers seeking "guinea pigs" who were willing to demonstrate that

Mexican H-2A labor could serve the region's labor needs.  APX 358, 362 (Campos

Depo. at 47:13–48:3, 81:10–20).  At this time, and indeed at all relevant times, Mr.

Campos and WKI had:

　　　(a) no experience whatsoever in supplying H-2A or any other type of farm

　　　labor to anyone, APX 368 (Campos Depo. at 15:24–17:20); 381 (Campos

　　　Depo. at 8:8–9:13); APX 399 (Cervantes Depo. at 22:11–23:5);

(b) no assets or any kind of tools needed for farm work (buckets, gloves, clippers, etc.), APX 356, 361–363 (Campos Depo. at 40:1–6, 74:3–7, 80:8–81:4, 82:23–83:1);

(c) no money paid from any person for WKI's work, APX 368 (Campos Depo. at 14:4–15:7); and

(d) no knowledge of farming or farmworker supervision, APX 353–54, 363 (Campos Depo. at 29:18–30:11, 82:18–82:22).

To be able to seek H-2A visas as an H-2A labor contractor, Mr. Campos wrote a one-page form entitled Agreement of Outsourcing Support ("Agreement"), which states that it is a "contract[]" between WKI, "a farm labor contractor," and a "farmer" by which WKI agreed to provide a specified number of farmworkers (including "U.S. Citizens, legal residents, or foreign workers with temporary working visas (H-2A)") to the farmer "on a daily basis" to perform specified crop work during a specified period of time.  APX 474 (Agreement).  Campos drafted this Agreement specifically to meet the requirements of 20 C.F.R. §§ 655.132, which requires an H-2A Labor Contractor to submit "[c]opies of the fully-executed work contracts with each fixed-site agricultural business [to which the H-2A Labor Contractor expects to provide H-2A workers]."  *See* APX 366, 382 (Campos Depo. at 7:14 to 8:12 and 20:8-25).

### 3.  WKI Contracts With Growers Including CABEI

Campos approached a number of agricultural employers with this Agreement and four agreed to enter into it, including Ronald Franzoy on behalf of RJF Farms, Inc., and Dino Cervantes on behalf of CAB and CEI.  APX 355 (Campos Depo. at 35:23 to 36:1); APX 373 (Campos Depo. at 50:20 to 51:2).  Mr. Campos considered the relationship with each of the four agricultural employers who signed the Outsourcing Support Agreement to be the "same," including their control over his recruiting activities.  APX 357 (Campos Depo. at 45:7-17); APX 364 (Campos Depo. 88:8-17); APX 366 (Campos Depo. at 7:9 to 9:13).

Ronald Franzoy owns and manages former defendant RJF Farms, Inc.  APX 418 (Franzoy Depo. at 7:24-25).  Messrs. Campos and Franzoy discussed WKI's plan to import Mexican H-2A workers many times, a plan that Ronald Franzoy enthusiastically supported.  APX 358 (Campos Depo. at 48:24 to 49:22); APX 420-422 (Franzoy Depo. at 39:16 to 49:17).  Ronald Franzoy and Jaime Campos signed WKI's form Agreement on September 22, 2011 in which RJF Farms, Inc. agreed that WKI "will recruit workers on its behalf" and provide 25 U.S. or foreign H-2A workers to process and pack dry red chile and onions between November 28, 2011 and March 9, 2012.  APX 423 (Franzoy Depo. at 54:6 to 55:1); APX 475 (Agreement).

At all relevant times, Dino Cervantes was the chief executive of CEI and the general manager of CAB, two businesses owned by his family. APX 395 (Cervantes Depo. at 7:14 to 8:13). CEI and CAB are long-established Southern New Mexico agricultural businesses with permanent employees, assets including several buildings, and millions of dollars in revenue each year. *See* APX 152 (Answer ¶ 5); APX 402 (Cervantes Depo. at 35:10-23); APX 472-73 (Interrogatory Response). Dino Cervantes and Jaime Campos signed WKI's form Agreement on September 10, 2011, in which CABEI agreed that WKI "will recruit workers on its behalf" and provide 15 U.S. or foreign H-2A workers to process and pack dry red chile and other spices between November 10, 2011 and March 9, 2012. APX 398 (Cervantes Depo. at 18:14 to 19:1); APX 474 (Agreement). The district court held that the record shows a genuine dispute as to whether Dino Cervantes signed the Agreement on behalf of CAB, CEI, or both. APX 698 n.2 (Order). When Dino Cervantes signed the Agreement, Dino Cervantes knew that Jaime Campos would use the Agreement to apply for H-2A workers, and that federal law required the Agreement as part of WKI's H-2A application. APX 355 (Campos Depo. at 35:10–13); APX 366-369 (Campos Depo. at 10:19 to 11:17 and 20:20 to 21:16); APX 397-398 (Cervantes Depo. at 18:22–19:1); *see also* 20 C.F.R. § 655.132(a)-(b)(4) ("work contracts" from "fixed-site employers" are required in order to submit an H-2A application).

### 4.  WKI Files an H-2A Application and Hires the Farmworkers

On September 29, 2011, Mr. Campos used the Agreements signed by growers Franzoy and Cervantes to petition for H-2A workers who would perform labor for fixed-site employers including CABEI and RJF farms.  APX 359 (Campos Depo. dated October 9, 2014); APX 369 (Campos Depo. dated Jan. 6, 2015); APX 382 (Campos Depo. dated March 15, 2016); APX 477–486 (Application).  WKI's H-2A application stated under penalty of perjury that the jobs did not require qualifications or experience, that all willing U.S. workers would be hired for the jobs prior to hiring any Mexican workers, and that the pay to all U.S. and Mexican workers would be $9.71 per hour.  APX 360 (Campos Depo. at 71:2-16); APX 442–43 (Lusinger Depo. at 32:19 to 33:9); APX 477–486 (Application); APX 530–547 (Clearance Order); APX 559 (Clearance Order Addendum).  These promises were required by federal law to apply for H-2A workers.  *Posadas de Puerto Rico Associates, Inc. v. Sec'y of Labor of U.S.*, 698 F. Supp. 396, 398 (D.P.R. 1988).  WKI's H-2A application included a copy of WKI's contract with CABEI stating that the workers hired would, *inter alia*, process and pack dry red chile and other spices "on a daily basis" for CABEI between November 10, 2011 and March 9, 2012.  APX 382 (Campos Depo. at 20:8-25); APX 474.

14

Beginning on October 14, 2011 and through November 11, 2011, WKI wrote DOL at least five times emphasizing the "Emergency Situation" and requesting permission to admit foreign H-2A workers due to the critical labor needs faced by the growers listed on WKI's H-2A application.  APX 382 (Campos Depo. at 21:18-24), APX 495 (Letter); APX 498 (Letter) APX 506 (Letter); APX 508 (Letter); APX 515 (Letter); APX 549 (Email); APX 551 (Email); APX 552 (Email).  Meanwhile, DOL and TWC identified numerous deficiencies in WKI's H-2A application, which WKI attempted to correct.  APX 487–516 (Letters).  One deficiency involved CABEI, and on October 27, 2011, Mr. Campos supplied DOL with additional detail concerning CABEI's business operations that Mr. Campos could only have obtained from Dino Cervantes or "people that work in the office." APX 373 (Campos Depo. at 51:5 to 53:8); APX 392 (Campos Depo. at 68:10-14); APX 509 (Letter).

During the recruitment period, TWC informed the Farmworkers about the job openings described WKI's H-2A clearance order.  APX 430-431 (Galvan Depo. 8:18-21 and 12:25 to 14:16).  Naturally, the Farmworkers Plaintiffs eagerly accepted the jobs because they paid over $2 more per hour than Plaintiffs were accustomed to earning.  APX 614 (Alfaro-Huitron Affidavit); APX 616–17 (Eleazar Garcia-Mata Affidavit); APX 618–19 (Jose Garcia-Mata Affidavit); APX 620–21 (Juan Guzman Affidavit); APX 856 (Esteban Alfaro Depo. at 19:17-20).

15

Each worker's acceptance created an employment contract under 20 C.F.R. §
655.122(q) ("In the absence of a separate, written work contract entered into
between the employer and the worker, the required terms of the job order and the
certified Application for Temporary Employment Certification will be the work
contract.").

### 5. WKI Falsely Blames Drought for Canceling Contracts

After Mr. Campos hired the Farmworkers, the record contains evidence
showing a genuine dispute as to whether the growers, including CABEI, decided
not to honor the contract with WKI and refused to provide work to the people WKI
had recruited and hired, including the Farmworkers.  APX 375 (Campos Depo. at
60:12-14) (Mr. Campos did everything "humanly possible" to avoid the "need to
cancel the contract."); APX 374 (Campos Depo. at 56:1 to 57:21) ("all four of the
growers" agreed to terminate the H-2A application); APX 594 (Campos Answer)
("we all together agreed that it was going to be unnecessary to have the extra
workers").

After these discussions with growers, including CABEI, Jaime Campos
refused to provide the work that WKI had promised to the Farmworkers, and
instead WKI falsely notified DOL that a drought required the job order to be
cancelled.  APX 522 (WKI Letter to DOL) ("Unfortunately, the agricultural
producers that WKI has contracted with to provide farm labor services have

16

informed WKI that due to severe drought conditions at the places of employment, there is no work to be performed at this time.").  Ronald Franzoy described Mr. Campos's drought explanation as follows:

> That's a bunch of kahooey.  The reason that he [cancelled the H-2A application is] because he wasn't able to get the people from Mexico in our agreement.  It had nothing to do with adverse [weather] conditions.

APX 427 (Franzoy Depo. at 89:6-10).  Mr. Campos could offer only one explanation for how the growers' labor needs went from emergency to none in eleven days, and that explanation is patently implausible: "It was a drought well known in the area for—for a long time."  APX 383–384 (Campos Depo. at 25:20 to 26:11).

This sequence of events, viewed in the light most favorable to the Farmworkers, suggests that it was the growers, including CABEI, and not Mr. Campos, who declined to provide the promised work even after Mr. Campos did everything humanly possible to avoid having to cancel the contracts with the workers.  *See Fassbender*, 890 F.3d at 882 (summary judgment standard).

Dino Cervantes testified that after he signed the Agreement on September 10, 2011, he never spoke to or heard from Jaime Campos or WKI again.  APX 397 (Cervantes Depo. at 14:1–11).  Rather than make any attempt to further communicate with WKI, Dino Cervantes simply directed his longtime farm labor contractor, Jesus Maldonado, to supply the laborers needed to perform the work

17

described in the Agreement between CABEI and WKI.  Mr. Maldonado testified
that he had no trouble finding U.S. workers to perform all work needed by CABEI
for 2011 and 2012, just as in prior and subsequent seasons.  APX 411 (Cervantes
Depo.); APX 454, 459 (Maldonado Depo. at 20:25 to 23:5 and 45:17-19).  Mr.
Maldonado supplied these U.S. workers to CABEI by paying the minimum wage
of $7.50 per hour.  APX 454, 458 (Maldonado Depo. at 20:8-13, 36:8-17, and
37:17-19).

Neither WKI nor CABEI provided work to Plaintiffs during the period for
which Plaintiffs were hired pursuant to the terms of the H-2A contract.  APX 432-
433 (Galvan Depo. at 16:18 to 17:17); APX 614-615 (Alfaro-Huitron Affidavit);
APX 616-617 (Eleazar Garcia-Mata Affidavit); APX 618-619 (Jose Garcia-Mata
Affidavit); APX 620-621 (Juan Guzman Affidavit).  In part because the season was
already underway, the Farmworkers attempted to find substitute work during this
period with limited and varying success.  *Id.*; APX 260-262 (Alfaro-Huitron Depo.
at 45:3-20 and 52:17); APX 266 (Guzman Depo. at 41:3-12).

## C.    **Proceedings Below**

The Farmworkers sued Jaime Campos, WKI, and other growers included on
the clearance order, including CAB and CEI, alleging breach of their H-2A
employment contracts, violation of AWPA, 29 U.S.C. §§ 1811, 1821, and 1822,
common-law fraud, and civil conspiracy.  APX 52-61 (Complaint).  All parties

except CABEI and Jaime Campos settled or defaulted.  APX 7-28 (Docket).
CABEI submitted three separate summary judgment motions which the
Farmworkers opposed.[4]  The district court decided CABEI's motions based on the
briefs without hearing argument.  The district court granted summary judgment
dismissing all claims against CABEI after holding:

(1) to prove that WKI acted as CABEI's agent, the Farmworkers must prove
that CABEI employed WKI and controlled "the manner in which the
details" of WKI's labor recruiting work were accomplished, APX 700;

(2) the summary judgment record contains insufficient evidence that CABEI
controlled the manner in which the details of WKI's labor recruiting
work were accomplished, APX 700-705;

(3) because all other claims against CABEI were dismissed (*i.e.* the record
contains insufficient evidence that CABEI itself engaged in actionable

---

[4] This briefing consists of:
(1) CAB First Motion, APX 167;
(2) CEI First Motion, APX 231;
(3) Farmworkers' Response Opposing CAB and CEI First Motions, APX
297;
(4) CABEI Second Motion, APX 622;
(5) Farmworkers' Response Opposing Second Motion, APX 655;
(6) CABEI Reply Supporting Both Motions, APX 663;
(7) CABEI Third Motion, APX 724;
(8) Farmworkers' Response Opposing Third Motion, APX 733; and
(9) CABEI Reply Supporting Third Motion, APX 943.

wrongdoing), no civil conspiracy could exist between CABEI's Dino

Cervantes and WKI's Jaime Campos, APX 720-722;

(4) CABEI's second motion for partial summary judgment is granted without

any discussion whatsoever of the motion or the response in opposition to

it, APX 722; and

(5) the summary judgment record contains insufficient evidence that CABEI

and WKI jointly employed the Farmworkers, APX 972-981.

The Farmworkers and Jaime Campos then agreed to try the remaining claims

before U.S. Magistrate Gregory J. Fouratt.  APX 25 (Docket Entry 267).  After

Jaime Campos settled on the eve of trial, the magistrate entered Final Judgment.

APX 982 (Order).  The Farmworkers timely appealed from the district court's

rulings granting summary judgment to CABEI.  APX 983 (Notice of Appeal).

## SUMMARY OF THE ARGUMENT

I.    The district court erred in holding that an agency relationship could

only exist if CABEI controlled the "manner in which WKI recruited workers."

APX 705 (Order).  The test applied by the district court is used to distinguish

independent contractors from employees, and is not the test for agency.

Independent contractors can be agents.  *See* RESTATEMENT (SECOND) OF AGENCY

§§ 2(3), 14N, 257, and 261.  Because the district court's summary judgment is

premised on its incorrect view that independent contractors cannot be agents, the judgment should be reversed for this error of law alone.

  II.  The record shows a genuine dispute of fact as to whether WKI acted as CABEI's non-servant (independent contractor) agent when WKI entered into work contracts with the Farmworkers.  CABEI agreed to have WKI "recruit workers on its behalf," specifically fifteen "skilled farm labor workers" who would process and pack dry red chile and other spices "on a daily basis" between November 10, 2011 and March 9, 2012.  APX 474 (Agreement).  CABEI further understood that WKI could not apply for H-2A workers without the Agreement, and signed it to facilitate WKI's H-2A application.  APX 355 (Campos Depo. at 34:25 to 35:22); APX 398 (Cervantes Depo. at 18:14 to 19:1); *see also* 20 C.F.R. § 655.132(b)(4) (requiring an H-2A Labor Contractor to submit "[c]opies of the fully-executed work contracts with each fixed-site agricultural business [to which the H-2A Labor Contractor expects to provide H-2A workers]").  WKI hired the Farmworkers exactly as specified within this Agreement, and thus acted as a non-servant agent with actual authority.  Further evidence of a non-servant agency relationship includes Jaime Campos's testimony that he would have done whatever CABEI requested regarding recruitment of workers, APX 361 (Campos Depo. at 76:1–77:8), testimony that is corroborated by Ronnie Franzoy.  APX 426-427 (Franzoy Depo. at 85:10 to 86:1).  The district court held otherwise only by

21

choosing which parts of inconsistent testimony to credit, reading testimony in the light least favorable to the Farmworkers, and ignoring circumstantial evidence that was inconsistent with its view of the facts, all of which are inappropriate on summary judgment.

III.    Entirely separate from agency, AWPA makes CABEI liable for breach of WKI's promises to the Farmworkers if CABEI and WKI were "joint employers." *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996). Joint employment depends on the economic reality of the workers' relationship to labor contractors and growers, as revealed by the seven factors listed in 29 C.F.R. § 500.20(h)(iv)(A)-(G). The district court agreed that three factors weigh in favor of finding that CABEI acted as the Farmworkers' joint employer, and erred in reading the record as to three others. First, the district court held that the Farmworkers presented insufficient evidence that CABEI would supervise the Farmworkers, but the Court agreed that the record "powerfully" shows that CABEI supervises its longtime labor contractor who has extensive experience, and WKI had no experience in or knowledge of farming at all, so CABEI would necessarily supervise WKI's workers. The record suggests no other reasonable option. Second, the district court held that CABEI did not retain control over hiring, firing, or paying WKI's workers, but ample evidence shows otherwise. Most importantly, Mr. Campos testified that he did everything "humanly possible" to provide work to

22

the Farmworkers, but was unable to do so after discussing the matter with all

growers, including CABEI.  The record overwhelmingly shows that CABEI acted

as a joint employer with WKI in relation to the Farmworkers.

> IV.     The district court erred by granting summary judgment on the issues

of civil conspiracy, abandonment, and damages without any discussion of the

arguments or relevant evidence on these issues.  *See* FED. R. CIV. P. 56(a) (The

court should state on the record the reasons for granting or denying [a motion for

summary judgment].”); *McIncrow v. Harris Cty.*, 878 F.2d 835, 835-36 (5th Cir.

1989) (Without “a detailed discussion by the trial judge . . . there is little

opportunity for effective review.”).  After the district court agreed that a wrongful

act by any “one of the conspirators” can be the predicate for a civil conspiracy

claim against all conspirators, the district court without explanation refused to

consider Jaime Campos’s wrongful acts as the predicate for the civil conspiracy

claim against CABEI.  The district court similarly erred by granting CABEI’s

second motion for partial summary judgment on the issues of abandonment and

damages without ever mentioning any argument made in this motion or the

response in opposition to it.

## STANDARD OF REVIEW

This Court reviews *de novo*: (a) the district court’s reading of New Mexico

law on independent contractors and agency, *Roberts v. Printup*, 422 F.3d 1211,

1215 (10th Cir.2005); (b) the district court's conclusion that the record shows no genuine dispute of fact as to whether WKI acted as agent of CABEI when WKI contracted with the Farmworkers, *see Fassbender v. Correct Care Sols.*, *LLC*, 890 F.3d 875, 882 (10th Cir. 2018); and (c) the district court's grant of summary judgment without considering the summary judgment evidence of civil conspiracy, abandonment, and damages, *id.*

This Court views all summary judgment evidence in the light most favorable to, and draws all reasonable inferences in favor of, the Farmworkers as the nonmoving party.  *Id.*; *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  There is a genuine dispute of material fact "if a rational jury could find in favor of the nonmoving party on the evidence presented."  *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).

## ARGUMENT

## I. The district court erred by holding that independent contractors cannot be agents.

The district court held that no agency relationship could exist between CABEI and WKI unless CABEI controlled the manner in which WKI recruited

workers.  APX 700-705 (district court applies this test on every page).[5]  This

holding conflates the test for agency with the test for distinguishing between

employees and independent contractors.  The test for distinguishing between

employees and independent contractors appears in RESTATEMENT (SECOND) OF

AGENCY § 220, and largely turns on control over the manner in which work is

performed.  The test for agency, by contrast, appears in RESTATEMENT (SECOND)

OF AGENCY § 1(1): "Agency is the fiduciary relation which results from the

manifestation of consent by one person to another that the other shall act on his

behalf and subject to his control, and consent by the other so to act."  These two

---

[5]  No authority supports this holding.  *Celaya v. Hall*, on which the district court
principally relies, only addresses whether certain facts indicate that a person is an
employee or an independent contractor, and says nothing about whether
independent contractors can be agents.  2004-NMSC-005, ¶¶ 7-21, 135 N.M. 115,
85 P.3d 239.  The district court also cites New Mexico Uniform Jury Instructions,
but these are explicitly limited to vicarious liability based on "*respondeat
superior*."  NM-UJI Civil 13-401 through 13-404.  *Respondent superior* is a basis
for vicarious liability that is entirely "distinct" from liability based on the acts of an
agent undertaken with actual authority.  RESTATEMENT (THIRD) OF AGENCY Ch. 2
Intro. Note (2006) (Separate sections on *respondeat superior* and actual authority
state "distinct bases on which the common law of agency attributes legal
consequences of one person's action to another person."); *see also* RESTATEMENT
(SECOND) OF AGENCY § 257 cmt. a ("The principal's liabilities [for an agent's
misrepresentations] do not depend upon the theory of Respondeat Superior, but
upon the reasons underlying liability upon authorized or apparently authorized
contracts.  If the statement is one which, if true, the agent would be authorized or
apparently authorized to make, the principal is subject to liability for it, although
deceitfully made."); NM-UJI Civil Chapter 4 Introduction (explicitly adopting
RESTATEMENT (SECOND) OF AGENCY § 2, which states that independent contractors
can be agents).

tests are distinct from one another as to the degree of control required.  *Quigley v. Rosenthal*, 327 F.3d 1044, 1064 & n.10 (10th Cir. 2003).

Some independent contractors are agents.  According to the New Mexico Supreme Court, an independent contractor "may or may not be an agent."  *Harger v. Structural Servs., Inc.*, 1996-NMSC-018, ¶ 14, 121 N.M. 657, 916 P.2d 1324 (quoting, adopting, and applying RESTATEMENT (SECOND) OF AGENCY §§ 2(3) (1958 and June 2019 Update)); *Elisberg v. Presbyterian Healthcare Servs., Inc.*, No. 05-cv-461, 2006 WL 8443756 at *4 (D.N.M. Aug. 10, 2006) (Under New Mexico law, [the company] could be both [Defendant]'s agent and independent contractor."); *see also Logue v. United States*, 412 U.S. 521, 527 (1973) (same).[6]

Independent contractors acting as agents are, by definition, not subject to control by the principal over the physical conduct of their work.  RESTATEMENT

---

[6] *Accord Maxwell v. St. Francis Health Ctr.*, No. 17-cv-4014, 2017 WL 4037732 at *10 (D. Kan. Sept. 13, 2017) ("An agent may be an employee or an independent contractor.  *See McCarthy v. Recordex Service, Inc.*, 80 F.3d 842, 853 (3rd Cir. 1996); *First Nat. Bank and Trust Co. v. Sidwell Corp.*, 678 P.2d 118, 124 (Kan. 1984)."); *Ditty v. CheckRite, Ltd., Inc.*, 973 F. Supp. 1320, 1335 (D. Utah 1997) ("the terms 'agent' and 'independent contractor' are not mutually exclusive"); *Wiggs v. City of Phoenix*, 10 P.3d 625, 628 (Ariz. 2000) ("While it is always the case that an independent contractor is not a servant, it is not always the case that an independent contractor is not an agent"); *Robles v. Consolidated Graphics, Inc.*, 965 S.W.2d 552, 558 & n.4 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) ("[E]ven if Robles was an independent contractor, it does not mean he could not also be an agent.  Independent contractor and agency status are not, as Robles contends, mutually exclusive."); *Cheney v. Hailey*, 686 P.2d 808, 811 (Colo. App. 1984) (same).

(SECOND) OF AGENCY § 14N (1958 and June 2019 Update); *Romero v. Shelton*, 1962-NMSC-118, ¶ 7, 70 N.M. 425, 374 P.2d 301  ("[T]his court has recognized the distinctions which exist between servants, agents, and non-servant agents. [One may be a] 'non-servant agent' . . . when his physical actions are not subject to direct control by the principal . . . ."), *overruled on other grounds by Archuleta v. Pina*, 1974-NMSC-021, ¶ 7, 86 N.M. 94, 519 P.2d 1175; *Jaramillo v. Thomas*, 1965-NMSC-156, ¶¶ 10-11, 75 N.M. 612, 409 P.2d 131 (same); *accord McKinney v. United States*, 724 Fed. Appx. 628, 631 (10th Cir. 2018) (unpublished) (A "non-servant agent" invokes "a different analytical framework . . . than would apply in the master-servant context.") (citing *Grease Monkey Int'l v. Montoya*, 904 P.2d 468, 474 (Colo. 1995)).  "[A] person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment."  RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c.

While principals are not liable for physical torts committed by non-servant agents,[7] principals are liable for: (a) contracts made by non-servant agents acting

---

[7] Because a principal has no control over a non-servant agent's physical conduct in accomplishing the assigned task, the principal is not subject to liability for the agent's physical torts:

> A principal employing another to achieve a result but not controlling or having the right to control the details of his physical movements is not responsible for incidental negligence while such person is conducting the

with actual authority, RESTATEMENT (SECOND) OF AGENCY §§ 50 ("authority to make a contract is inferred from authority to conduct a transaction") and 140 ("liability of the principal to a third person upon a transaction conducted by an agent . . . may be based upon the fact that . . . the agent was authorized"); and (b) misrepresentations made by non-servant agents who the principal puts in a position to mislead, RESTATEMENT (SECOND) OF AGENCY §§ 257 (liability for authorized misrepresentation) and 261 ("A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.").  The Farmworkers' claim is that WKI acted within the scope of its agency when it recruited and hired them to work for CABEI and that as a result, CABEI is liable on the Farmworkers' contract with WKI.  *See* Part II, *infra*.

"[M]ost of the persons known as agents, that is, brokers, factors, attorneys, collection agencies, and selling agencies are independent contractors as the term is

---

authorized transaction.  Thus, the principal is not liable for the negligent physical conduct of an attorney, a broker, a factor, or a rental agent, as such. In their movements and their control of physical forces, they are in the relation of independent contractors to the principal.  It is only when to the relation of principal and agent there is added that right to control physical details as to the manner of performance which is  characteristic of the relation of master and servant that the person in whose service the act is done becomes subject to liability for the physical conduct of the actor.

*Jaramillo*, 1965-NMSC-156, ¶ 10.

used in the Restatement." RESTATEMENT (SECOND) OF AGENCY § 14N cmt. a (1958 and June 2019 Update). Thus, the district court's holding that independent contractors cannot bind principals to contracts risks far-reaching unintended consequences unless it is reversed. And because the district court never considered the proper "independent contractor" definition of agent, discussed next, remand for further proceedings in the district court is necessary.

## II. The summary judgment record shows a triable fact issue as to whether WKI acted as CABEI's non-servant agent in contracting with the Farmworkers.

### A. Independent contractors acting within the scope of their authority are agents who can bind principals to authorized transactions.

"An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair[,] or does some service for the principal, with or without compensation." *See Barron v. Evangelical Lutheran Good Samaritan Soc.*, 2011-NMCA-094, ¶ 16, 150 N.M. 669, 265 P.3d 720; *Allstate Ins. v. Ford Motor Credit Co.,* No. 04-cv-1285, 2006 WL 8444504, at *7 (D.N.M. Feb. 24, 2006) (same); RESTATEMENT (SECOND) OF AGENCY § 14N ("One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor."). "A principal is bound by the acts of his or her agent within the agent's actual designated authority

and is also bound by the acts of the agent that the principal holds the agent out to the public as possessing." *Id.* (quotation omitted).

With respect to the degree of control that a principal exercises over an independent contractor agent, New Mexico "case law has not required a particularly invasive level of control to support a finding that a principal-agent relationship exists." *N.M. Military Inst. v N.M.M.I. Alumni Ass'n, Inc.*, No. A-1-CA-35621, 2018 WL 5262677 at *5 ¶ 22, __ P. 3d __ (N.M. Ct. App. 2019) (collecting cases). Indeed, the principal's right to control an independent contractor agent may be demonstrated simply by the limits that the principal places on the agent's authority at the time the agent is hired and before the agent takes any actions. RESTATEMENT (SECOND) OF AGENCY § 14 cmt. a ("[T]he right of control by the principal may be exercised by prescribing what the agent shall or shall not do before the agent acts . . . ."). Thus, the scope of actual authority given to the agent by the principal *is* the control that a principal exercises over its independent contractor.

Absent contrary evidence, "a principal has the right to control the conduct of the agent with respect to matters entrusted to him." RESTATEMENT (SECOND) OF AGENCY § 14; *see also Appleby v. Kewanee Oil Co*., 279 F.2d 334, 336 (10th Cir. 1960) (applying § 14 to evaluate evidence of control; appellee "misconceives the meaning of 'control' by limiting it to its physical, master-servant sense"). A

principal may choose to impose only the most general controls on its agent, or no controls at all, leaving it to the agent to exercise . . . discretion in accomplishing the assigned task.  *See* RESTATEMENT (SECOND) OF AGENCY § 14 cmt. b. ("If it is otherwise clear that there is an agency relation, as in the case of recognized agents such as attorneys at law, factors, or auctioneers, the principal, although he has contracted with the agent not to exercise control and to permit the agent the free exercise of his discretion, nevertheless has power to give lawful directions which the agent is under a duty to obey if he continues to act as such.").

### B.  The record shows a genuine dispute as to whether WKI acted as CABEI's non-servant agent.

The "Agreement of Outsourcing Support" is the primary evidence of WKI's agency status and it, alone, is sufficient to create a fact issue as to whether WKI was CABEI's agent for recruiting and hiring workers.  On its face, it is an agreement between CABEI and WKI by which WKI, "a farm labor contractor" agrees to "provide 15 farmworkers" (including "US Citizens, legal residents, or foreign workers with temporary working visas (H-2A)") to CABEI to process and pack "Dry Red Chile & Other Spices . . . on a daily basis for the length of th[e] agreement," which was between November 10, 2011 and March 9, 2012.  APX 474 (Agreement).  The Agreement by which CABEI authorized WKI to "recruit workers on its behalf" is by itself evidence from which a jury could find an agency relationship.  As the Fifth Circuit stated in precisely this context, "it is hard to

conjecture any circumstance in which the contractor would not be the 'agent,' for at least some purposes, of a farmer who communicated with him in advance to recruit labor." *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1334 (5th Cir. 1985).

The necessary control by the principal is clearly set forth in the Agreement by limiting WKI's authority to hiring 15 workers for a specified period.  As long as that was what WKI did, a jury could find that WKI was acting as CABEI's non-servant agent.  *See Romero*, 1962-NMSC-118, ¶ 7 (citing RESTATEMENT (SECOND) OF AGENCY § 1).  The fact that the Agreement does not contain all of the terms of work that would be offered to workers likely reflects the fact that both CABEI and WKI knew that those terms would be dictated by DOL's H-2A regulations. Regardless, as explained above, the fact that the principal leaves such matters largely, or even entirely, to the discretion of the agent does not mean an agency relationship was not created by the  Agreement. *See, e.g., Chicago R.I. & P Ry. Co v. Chichasha Nat Bank*, 174 F.923 (8th Cir. 1909) (agent was authorized to purchase cotton for principal from any persons having cotton at any price the agent deemed acceptable).[8]

---

[8] Absence of detail in the Agreement regarding the terms to be offered the recruited workers does not prevent this single page Agreement from being a contract because the document itself proves that the parties intended it to be a "contract," and both Dino Cervantes and Jaime Campos testified that they signed the document to comply with the "work contract" requirement of  20 C.F.R. §§

But the face of the agreement is not the only evidence supporting the existence of an agency relationship between CABEI and WKI.  To determine whether one party acts as the agent of another, courts must consider all facts and circumstances showing the parties' actual relationship. [9]  *Benavidez v. Sierra Blanca Motors*, 1998-NMCA-070, ¶ 13, 125 N.M. 235, 959 P.2d 569 (collecting cases).  This includes the following record evidence:

1.  Dino Cervantes testified that he signed the Agreement specifically for the purpose of facilitating WKI's H-2A application, knowing that WKI needed and would use the signed Agreement to satisfy DOL's "work contract" requirement.  APX 355 (Campos Depo. at 34:25 to 35:22); APX 398 (Cervantes Depo. at 18:14 to 19:1); *see also* 20 C.F.R. § 655.132(b)(4) (requiring an H-2A Labor Contractor to submit "[c]opies of the fully-executed work contracts with each fixed-site agricultural business [to which the H-2A Labor Contractor expects to provide H-

---

655.132(b)(4).  APX 355 (Campos Depo. at 34:25 to 35:22); APX 366–369 (Campos Depo. at 10:19 to 11:17 and 20:20 to 21:16).

[9]  The district court agreed, holding that agency agreements "may be oral or written, and may be expressed or implied by a course of conduct showing an intent that the [agency] relationship exists."  APX 700 (Order); *accord Estate of Anderson v. Denny's, Inc.*, 987 F. Supp. 2d 1113, 1149 (D.N.M. 2013) ("The degree of control giving rise to liability depends on the particular facts of each case." ); *Gallegos v. Citizens Ins. Agency*, 1989-NMSC-055, ¶ 17, 108 N.M. 722, 779 P.2d 99 ("The question of agency is normally one of fact and is to be determined from all attendant circumstances, in conjunction with the conduct and the communications of the parties.").

2A workers]"); APX 366–369 (Campos Depo. at 10:19 to 11:17 and 20:20 to

21:16).  In providing the Agreement for the purpose of an H-2A application, Mr.

Cervantes knew, or certainly should have known, that the H-2A application would

necessarily entail making binding job offers to U.S. workers who accepted the H-

2A job.

      2.  Although not necessary to establish an independent-contractor agency

relationship, Jaime Campos testified that WKI would "have followed whatever

directions" CABEI gave him, including as to recruiting.  APX 361 (Campos Depo.

at 75:13 to 77:8).[10]

---

[10]  The district court takes Mr. Campos's testimony that "there was no control" out
of context and then chooses to credit it over Mr. Campos's contrary testimony.
APX 702-703 (discussing APX 364 (Campos Depo. at 88:8-17)).  Neither is
appropriate.  In context, Mr. Campos confirmed that the farmers had the right to
control WKI's recruitment activities, even if no farmer exercised that right.  APX
361, 364 (Campos Depo. at 76:1–77:8; 86:5–16; 88:8–17).  Mr. Campos testified
that he would "have followed whatever directions [the farmers] gave [him] about
where to do recruiting," but "there was no control *other than as a customer
whenever needed* to—to ask me for some specifics, but it didn't happen.  *We never
got to that point*."  *Id.* (emphasis added).  Although it "never got to th[e] point" at
which the farmers had asked him to make a change with respect to recruiting, Mr.
Campos's testimony is unambiguous: he would have followed the farmers'
instructions.  Any testimony suggesting that no farmer had any right to control the
results of WKI's recruiting efforts is inconsistent with the record evidence cited in
Part II.A., *supra,* and with the district court's own holding that Mr. Campos's
statements that he always recruited in the "best interest" of the farmers and
attempted to "do things the way the farmers wanted" could be read to indicate
control over the results of the "result to be accomplished."  APX 703 (Order).  The
district court erred by choosing which parts of Mr. Campos's testimony to credit,
and by taking that testimony out of context.

3.  Campos represented to the federal government, through his H-2A applications, that he was hiring workers on behalf of CABEI, and did so under penalty of perjury.  APX 382 (Campos Depo. at 20:8-25); APX 889 (Campos Declaration to DOL); APX 890 (Attachment to H-2A Application); 20 C.F.R. § 655.132(b)(4) ("copies" of fully-executed work contracts must be submitted).

4.  WKI had no assets, no farm, no crops, no other customers, and no knowledge of farming or farm operations.  APX 353–363 (Campos Depo. at 29:18 to 30:11, 40:1–6, 74:3–7, 80:8 to 81:4, 82:23 to 83:1); APX 368 (Campos Depo. at 15:24 to 17:20); APX 381 (Campos Depo. at 8:8 to 9:13).  CABEI, by contrast, consists of two businesses with substantial assets and experience in the agricultural industry.  APX 152 (Answer ¶ 5); APX 402 (Cervantes Depo. at 35:10-35); APX 472–73 (Interrogatory Response).  The difference in power alone indicates that CABEI dictated all terms of its relationship with WKI.

5.  Finally, although controlling WKI's recruitment activities is not a necessary element of the independent contractor agency relationship, Ronald Franzoy testified that he retained the right to control WKI's recruiting activities. APX 426-427 (Franzoy Depo. at 85:10 to 86:1).  Franzoy's RJF Farms had the same rights as CABEI with respect to WKI: Franzoy signed the same Agreement that Dino Cervantes signed, and did so to support the same H-2A application submitted by WKI.  APX 67-68 (Agreements); APX 79 (Attachment to H-2A

Application).  Jaime Campos testified that he treated both agricultural companies "the same" for all recruiting under these agreements.  APX 357, 364 (Campos Depo. at 45:7–17 and 88:8–17); APX 366-368 (Campos Depo. at 7:9 to 9:13).  Franzoy's admitted control, combined with the evidence of identical treatment for CABEI, should allow a jury to conclude that CABEI retained a right to control WKI at least sufficiently to support a finding that WKI was an independent contractor agent.

To reject this argument, the district court chose to believe Jaime Campos over Ronald Franzoy.  APX 702 (Order) (observing that Franzoy's "evidence directly contradicts" Campos's testimony).  This not allowed on summary judgment.  *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.  At the summary judgment stage, our role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." (citations omitted)).  Worse, the supposed contradiction between Messrs. Campos and Franzoy does not exist, for the district court misread Mr. Campos's testimony as described in note 10, *supra*.

The district court also erred by confusing control with the right to control. *Id.* ("Mr. Franzoy's statements that he expected to maintain control of the workers in his fields and that he only wanted workers from Mexico *does not show that he exercised control* over the manner in which WKI recruited those workers.") (emphasis added). Under New Mexico law, a principal's right to control another is sufficient to establish an agency relationship even absent actual control. *Segura v. Colombe*, 895 F. Supp. 2d 1141, 1150 (D.N.M. 2012).

The record evidence cited above should permit a jury to decide whether WKI acted as CABEI's agent in recruiting the Farmworkers. The district court improperly required evidence "specifically demonstrating that the Cervantes Defendants had the right to control the manner in which WKI recruited workers." APX 705 (Order). While that might be the proper standard if the Farmworkers were seeking to hold CABEI liable for a physical tort committed by WKI, it is not the proper standard where the claim is that CABEI is liable on the contract that WKI entered into with the Farmworkers on behalf of CABEI. As to that claim, there is ample evidence from which a jury could conclude that WKI was acting as CABEI's agent in recruiting and hiring workers.

## III. The summary judgment record shows a triable fact issue as to whether CABEI jointly employed the Farmworkers under AWPA.

Independent of all agency arguments discussed above, the Farmworkers claim that CABEI is liable to them for violating AWPA, 29 U.S.C. § 1822(c),

37

which provides that "[n]o farm labor contractor [or] agricultural employer . . .

shall, without justification, violate the terms of any working arrangement made by

that contractor, employer, or association with any migrant agricultural worker."

The district court dismissed this claim on summary judgment after holding that the

record does not show that the Farmworkers were economically dependent on

CABEI to a degree sufficient to render CABEI their "employer."  APX 980-981

(Order).  The record shows otherwise.

### A. AWPA joint employment is broadly defined.

AWPA adopts the same definition for "employ" as that used in the Fair

Labor Standards Act ("FLSA"), which is "suffer or permit to work."  29 U.S.C. §

203(g) (FLSA); 29 U.S.C. § 1802(5) (AWPA).  This is a definition of "striking

breadth."

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  It is intended to

expand the common-law definition of employment, such as that described in

RESTATEMENT (SECOND) OF AGENCY § 220.  *See Salinas v. Commercial Interiors,*

*Inc.*, 848 F.3d 125, 136 (4th Cir. 2017); *accord Antenor v. D & S Farms*, 88 F.3d

925, 929 (11th Cir. 1996) ("in defining 'employment' under [the FLSA and

AWPA], Congress expressly rejected the common-law definition of employment

which is based on limiting concepts of control and supervision.").

Congress broadened the definition of "employ" to impose a duty on growers to ensure that their farm labor contractors honor the promises made to farm workers. *Torres-Lopez v. May*, 111 F.3d 633, 638-39 (9th Cir. 1997) (describing AWPA history and purpose); *see also Antenor,* 88 F.3d at 930 ("Congress' plain intent . . . was to protect migrant and seasonal workers from abuse and exploitation, and to hold agricultural employers fully accountable as joint employers whenever the facts suggest that liability is fairly imposed.") (internal citations omitted); *Caro-Galvan v. Curtis Richardson, Inc*., 993 F.2d 1500, 1505 (11th Cir. 1993) ("[b]road construction of [AWPA] comports with [its] humanitarian purpose to protect all those hired by middlemen to toil in our nation's fields, vineyards and orchards") (internal citation omitted); *Castillo v. Case Farms of Ohio, Inc*., 96 F. Supp. 2d 578, 589 (W.D. Tex. 1999) (Under AWPA, employers cannot "shield[] themselves from liability for mistreating employees [b]y hiring (and thereby shifting liability to) intermediary" labor contractors.).

Consequently, AWPA makes "agricultural entities . . . directly responsible for farmworkers who, as a matter of economic reality, depend[] upon them, even if the workers were hired or employed by a middleman or independent contractor." *Antenor*, 88 F.3d at 930. "Congress' plain intent was to protect migrant and seasonal workers from abuse and exploitation, and to hold 'agricultural employers' fully accountable as joint employers whenever the facts suggest that liability is

fairly imposed." *Id*.; *Fanette v. Steven Davis Farms, LLC*, 28 F. Supp. 3d 1243, 1254 (N.D. Fla. 2014) (citing 29 C.F.R. §§ 500.20(h)(4)-(5) and 29 C.F.R. § 791.2(a)).   "Whether an entity qualifies as a joint employer is a question of law" for the court to decide.  *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1285 n.12 & 1293 (11th Cir. 2016).  "[T]he ultimate question to be determined" by the court "is the economic reality – whether the worker is so economically dependent upon the agricultural employer/association as to be considered its employee." 29 C.F.R. § 500.20(h)(5)(iii).  Courts consider seven factors to discern economic dependence:

(1) whether the employer has the power through the control of a farm labor contractor to direct, control or supervise the worker – even if the control is indirect;

(2) whether the employer has the power, directly or indirectly, to hire, fire, modify the employment conditions of, or determine method or amount of wage payment;

(3) the degree of permanency and duration of the relationship of the parties;

(4) the extent to which services rendered are repetitive, rote tasks requiring skills with little training;

(5)  whether the activities are an integral part of the business operation of the agricultural employer;

(6) whether the work is performed on the agricultural employer's premises, rather than the premises owned by another business entity; and

(7) whether the agricultural employer has responsibilities related to workers commonly performed by employers – including segregation and payment of social security and unemployment taxes.

29 C.F.R. § 500.20(h)(iv)(A)-(G).  No one factor is determinative.  The factors are only a means of determining whether a putative joint employer has a "substantial role in determining the essential terms and conditions of a worker's employment." *Commercial Interiors*, 848 F.3d at 142; *Antenor*, 88 F.3d at 932-33.

**B. The record shows a genuine dispute on the issue of joint employment.**

The district court properly held that the record shows that factors (4), (5), and (6) weigh in favor finding that CABEI jointly employed the farmworkers. APX 977-979 (Order).

As to factor (1), the district court held that the record contains insufficient evidence that CABEI had the "power to direct, control, or supervise, both indirectly and indirectly," the labor to be performed by the Farmworkers.  APX 972-975 (Order) (emphasis omitted).  But Mr. Campos testified that he would not supervise any of his H-2A workers, and instead the farmers would handle all supervision.  APX 770 (Campos Depo. 82:8-22).  WKI in fact had no knowledge of farming or how to supervise farm laborers.  *Id.*; Page 11, *supra* (citing record).

41

WKI's complete inability to supervise farmworkers necessarily means that CABEI alone controlled supervision. The district court agreed that the record "powerfully suggests" that CABEI controls supervision of workers supplied by its longtime contractor Jesus Maldonado. APX 973 (Order);[11] *see also* APX 793 (Maldonado Depo. at 26:5-16) ("it's been many years now that there is no other employees, only the ones I bring"). But the court held that the experience of Mr. Maldonado's workers to be irrelevant because nothing indicated that CABEI would treat WKI's workers the same as Mr. Maldonado's. APX 973 (Order). The Farmworkers submit that the *only* reasonable inference from the record is that CABEI would treat WKI's workers no differently than Mr. Maldonado's workers because the wholly inexperienced WKI had no capacity to supervise farm laborers to a greater extent than the thoroughly experienced Maldonado. *See Rodriguez v. SGLC, Inc.*, No. 08-cv-1971, 2012 WL 5704403 at *7-8 (E.D. Cal. Nov. 15, 2012) (evidence of how an employer customarily treats seasonal workers is relevant to AWPA joint

---

[11] CABEI decides the order in which fields are harvested, and the number of workers Maldonado will use. APX 790-791 (Maldonado Depo. at 12:8-24 and 14:4-24); *see Fanette*, 28 F. Supp. 3d at 1243 (choosing fields shows control of work). CABEI instructed Maldonado's workers in the fields. APX 791 (Maldonado Depo. 14:4-24). Dino Cervantes himself testifies that he vets the quality of work performed by field workers. APX 936 (Cervantes Depo. at 48:1-22 ("If somebody didn't harvest chile to quality standards, I'll tell the contractor that he didn't do good job.").

employment factors despite the employer's claim that plaintiffs did not actually perform work during the same season).

As to factor (2), the district court held that the record contains insufficient evidence that CABEI retained "direct or indirect power to hire or fire, modify employment conditions, or determine rates or methods of pay." APX 975-976 (Order). First, the record shows a genuine dispute as to whether CABEI actually controlled who was hired and fired because Jaime Campos testified that he attempted everything "humanly possible" to honor his contracts, and repeatedly pointed to his discussions with the growers, including CABEI, and cited them as his reason for having to renege on WKI's work contracts with the Farmworkers. *See* Statement of the Case, Part B.5, *supra* (citing record). Second, the record shows a genuine dispute as to CABEI's influence over the rates and methods of pay. A grower influences wages by deciding whether workers will be compensated hourly or on a piece rate. *See Fanette*, 28 F. Supp. 3d at 1260. Here, wages were to be paid hourly for WKI's workers, APX 766-767 (Campos Depo. 52:4 to 53:18), just as CABEI has historically paid for Maldonado's workers. APX 940-941 (Maldonado Depo. at 16:5-16 and 17:10-23). CABEI retained the right to see and be aware of what Mr. Maldonado paid to each worker. APX 459 (Maldonado Depo. at 43:22 to 44:7). CABEI's secretary calculates wages and pays Maldonado a lump sum amount that he distributes to workers. APX 798-800

(Maldonado Depo. at 37:9 to 38:25 and Exhibit 4). A genuine dispute exists as to CABEI's capacity to hire and fire field workers and to determine the method and amount of their wages.

As to factor (7), the district court held that the record contains insufficient evidence that CABEI undertook "responsibilities ordinar[ily] performed by employers." APX 979-980 (Order). First, CABEI and WKI agreed that it is "contractually forbidden for the parties who will recruit workers on its behalf from seeking or receiving payments from prospective workers for costs which are to be borne by the employer." APX 474 (Agreement). The only rational explanation for inclusion of this odd sentence in CABEI's otherwise vague agreement is that the provision is required by 20 C.F.R. § 655.135(k). Parties who invoke this regulation understand that the grower is the workers' employer. *Id.* Thus, presence of this clause in the parties' agreement proves that CABEI undertook responsibilities ordinarily performed by employers. Second, CABEI's longstanding, consistent practice has been to deduct social security and unemployment taxes from the amounts paid to its farm labor contractor and give those amounts to the contractor in one lump sum at the end of the month for the contractor to forward to the taxing authorities. APX 798-800 (Maldonado Depo. at 37:20-24 and 38:21-25 and Exhibit 4); *see Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1322 (5th Cir. 1985) (lump sum payments are not inconsistent

with joint employment).  Third, the record conclusively establishes that WKI had

no assets, customers other than those listed in its H-2A application, or ability to

pay anyone without CABEI first providing the money.  APX 360-362 (Campos

Depo. at 72:10-21, 74:3 to 75:8, and 80:8 to 81:1).

At most, only factor (3) can weigh in CABEI's favor.  On *de novo* review,

this Court should hold that the record contains sufficient evidence to support a

finding that as a matter of economic reality, the Farmworkers were sufficiently

dependent on CABEI to render CABEI their joint employer.

## IV.    The district court erred by granting summary judgment on three issues without ever considering any relevant evidence.

As to civil conspiracy, abandonment, and damages, the district court granted

summary judgment without any discussion of how the Rule 56 standard was met.

This is reversible error.  *See* Fed. R. Civ. P. 56(a) ("The court should state on the

record the reasons for granting or denying [a motion for summary judgment].");

*Phelps v. State Farm Mut. Auto. Ins. Co*., 736 F.3d 697, 705 (6th Cir. 2012)

(district court erred by failing to consider, or explaining why it did not consider,

record evidence presented in opposition to summary judgment); *McIncrow v.

Harris Cty*., 878 F.2d 835, 835-36 (5th Cir. 1989) (Without "a detailed discussion

by the trial judge . . . there is little opportunity for effective review.").

**A. The district court failed to consider the evidence of Jaime Campos's wrongful acts as the predicate for the Farmworkers' civil conspiracy claim against CABEI.**

The district court correctly reports that civil conspiracy is not actionable of itself, and is instead only a form of vicarious liability that requires proof of actionable wrongdoing by "one of the conspirators."  APX 720 (Order) (quoting *Ettenson v. Burke*, 2001-NMCA-003, ¶ 23, 130 N.M. 67, 17 P.3d 440).  But then without any explanation, the district court granted CABEI summary judgment on the Farmworkers' civil conspiracy claim without ever mentioning the Farmworkers' evidence that Jaime Campos and WKI committed wrongful acts, most importantly fraud, which are the predicate for the Farmworkers' civil conspiracy claim against CABEI.  APX 338 (Response Opposing MSJ) ("Even if [CABEI] did not directly defraud Plaintiffs[,]the summary judgment record contains ample evidence that Mr. Campos's fraud alone suffices for the [wrongful act] element of [CABEI's] conspiracy liability."); *id.* at 337-339 (detailing summary judgment evidence showing that Dino Cervantes conspired with Jaime Campos to access foreign guestworkers without hiring U.S. workers, and defrauded the Farmworkers as part of their plan to violate federal law); APX 697 (Order) (the district court acknowledges that the Farmworkers made WKI's wrongful acts the predicate for their conspiracy claim against CABEI).  By holding that wrongful act of only "one" coconspirator need be proved, and then failing to

46

consider the evidence of the wrongful acts committed by Jaime Campos and WKI, the district court erred in granting summary judgment on the Farmworkers' civil conspiracy claim.

"The existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide." *Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980). The district court did not consider whether a conspiracy existed, and instead only held that because CABEI itself committed no fraud, no liability exists for any civil conspiracy. APX 722 (Order).

A genuine dispute exists as to whether CABEI and WKI conspired to evade federal law. First, CABEI admits that it did not need any additional U.S. workers from WKI, because it never had any difficulty finding as many U.S. workers as it needed, including in 2011 and 2012. APX 459 (Maldonado Depo. at 45:13-19); APX 791 (Maldonado Depo. at 14:15-24). As Dino Cervantes succinctly put it, "We have relationships with other people that would hire U.S. workers. If [Mr. Campos] was going to do the same thing that I have other people that can do it, why would I hire him?" APX 401 (Cervantes Depo. at 33:12-15). CABEI therefore had no legitimate business in joining WKI's H-2A application.

Second, CABEI claims that it never reached any agreement with Jaime Campos as to how much money CABEI would pay WKI. APX 399-400 (Cervantes Depo. at 24:1 to 27:16); APX 175 (Motion). This is contradicted by

Jaime Campos, who states that the rate for all farmers was $1 per hour above the wage required under H-2A.  APX 368 (Campos Depo. 14:2-13); APX 766-767 (Campos Depo. 52:4 to 53:18).  It is also contradicted by Ronald Franzoy, who testified that that the agreed wage was actually an illegal one of $1 per hour above minimum wage.  APX 425 (Franzoy Depo. at 74:22 to 75:14).  After WKI cancelled its H-2A application, CABEI found all U.S. workers it needed by paying only minimum wage of $7.50 per hour, which is at least $2.21 less per hour than CABEI would have been required to pay under WKI's H-2A application.  APX 453-455 (Maldonado Depo. at 14:15 to 15:5, 16:9 to 17:23, 19:21 to 21:10, and 22:22 to 23:22).  Because CABEI had no business reason to pay so much more for labor, a jury could reasonably conclude that CABEI never intended to do so.

### B. The district court granted CABEI's second motion for partial summary judgment without mentioning its merits.

CABEI's second summary judgment motion argued that "even if" the Farmworkers have valid employment contracts that are enforceable against CABEI, partial summary judgment in CABEI's favor is still proper on the issues of abandonment and damages.  APX 622 (Motion).  The Farmworkers responded in opposition.  APX 655 (Response).  The district court granted this second summary judgment motion without ever mentioning anything about its merits or any argument or evidence relevant to it.  APX 722 (Order).   This was error under the text of Rule 56(a).

## CONCLUSION

The Court should reverse the district court's summary judgments in ECF Nos. 232 and 246, and remand for trial of whether WKI acted as agent of CABEI when WKI contracted with the Farmworkers, whether CABEI jointly employed the Farmworkers, and whether Dino Cervantes conspired with Jaime Campos to defraud the Farmworkers.

## ORAL ARGUMENT REQUEST

The Farmworkers request oral argument to assist the Court in: (a) discerning how agency principles apply to foreign guestworker contracting, which the district court identified as a novel issue in this circuit, *see* APX 708 (Order); and (b) gauging the sufficiency of the summary judgment evidence.

Respectfully submitted,

October 4, 2019

TEXAS RIOGRANDE LEGAL AID
1331 Texas Avenue
El Paso, Texas 79901
(915) 585-5120

*/s/ Jerome Wesevich*
Jerome Wesevich
 jwesevich@trla.org
Christopher Benoit
 cbenoit@trla.org

*Attorneys for All Appellants*

## CERTIFICATE OF DIGITAL SUBMISSION

In accord with the Court's CM/ECF User's Manual, I hereby certify that all required privacy redactions have been made from the foregoing Brief.  In addition, I certify that the hard copies of this pleading that may be required to be submitted to the court are exact copies of the ECF filing, and the ECF submission has been scanned for viruses with the most recent version of a commercial virus scanning program—specifically Sophos Endpoint Security, Version 10.8, Updated October 1, 2019) and, according to the program, is free of viruses.

*/s/ Jerome Wesevich*
Attorney for Appellants

## CERTIFICATE OF COMPLIANCE

Pursuant to FED. R. APP. P. 32(g), Counsel for Appellants certifies that this document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B), because, excluding the parts of the document exempted by Rule 32(f) and 10th Cir. R. 32(B), this document contains **11,664** words. Counsel for Appellants further certifies that this document complies with the typeface requirements of Rule 32(a)(5) and 10th Cir. R. 32(A), and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman in 14-point font.

*/s/ Jerome Wesevich*
Attorney for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2019, a true, complete, and correct copy of the foregoing Brief and subsequent attached orders was served on the following counsel for all Appellees by digital submission via email and the Court's CM/ECF program: Joseph Cervantes, 2601 S. Espina St., Las Cruces, NM, 88001, (575) 526-5600, joe@cervanteslaw.com.

*/s/ Jerome Wesevich*
Attorney for Appellants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ESTEBAN ALFARO-HUITRON,
ELEAZAR GARCIA-MATA,
JOSE ANTONIO GARCIA-MATA,
JUAN GUZMAN, JOSE GERARDO JASSO,
RAUL JASSO-CERDA, ISMAEL MARTINEZ
GONZALEZ, ENRIQUE ROJAS-TORRES,
LAZARO ROJAS-TORRES,
TRINIDAD SANTOYO-GARCIA
PEDRO TAMEZ, ANGELA TREJO,
EFRAIN TREJO, SANTOS TREJO,
and YANETH TREJO,

No. CV 15-210 JCH/JHR

      Plaintiffs,

v.

WKI OUTSOURCING SOLUTIONS, LLC,
JAIME CAMPOS, CERVANTES AGRIBUSINESS,
CERVANTES ENTERPRISES, INC.,
RJF FARMS, INC., RONNIE J. FRANZOY,
TIERRA DE DIOS FARMS, LLC,
LACK FARMS, INC. and SKYLINE PRODUCE, LLC

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

      This matter is before the Court on the Motion for Summary Judgment by Defendant Cervantes Agribusiness **[Doc. 185]** the Motion for Summary Judgment by Defendant Cervantes Enterprises, Inc. **[Doc. 186]**, and Cervantes Defendants' Motion for Partial Summary Judgment Based on Plaintiffs' Alleged Contract and Limited Contract Remedies **[Doc. 208]**. After careful consideration of the motions, briefs, and relevant law, the Court concludes that all three of the Cervantes Defendants' motions shall be granted.

Plaintiffs allege four causes of action against Cervantes Agribusiness and Cervantes Enterprises, Inc. (collectively, "Cervantes Defendants"): violation of the Agricultural Worker Protection Act, fraud, breach of contract, and civil conspiracy. The allegations are largely based on an agreement between Dino Cervantes, the general manager of both Cervantes Defendant entities, and Defendant Jaime Campos, representative of Defendant WKI Outsourcing Solutions, LLC ("WKI"). Mr. Campos and Mr. Cervantes signed an agreement under which Mr. Campos would provide 15 agricultural workers to work for Mr. Cervantes from November 10, 2011 to March 9, 2012. **[Doc. 206-2, p. 1]** The Agreement states that the workers would be skilled farm laborers and would be United States citizens, legal residents, or foreign workers with temporary H-2A working visas. **[Doc. 206-2, p. 1]**

## I. THE PLAINTIFFS

Only nine of the 14 plaintiffs in this case assert causes of action against the Cervantes Defendants. Those nine are: Esteban Alfaro-Huitron, Eleazar Garcia-Mata, Jose Antonio Garcia-Mata, Juan Guzman, Enrique Rojas-Torres, Lazaro Rojas-Torres, Raul Jasso-Cerda, Trinidad Santoyo-Garcia, and Pedro Tamez.

## II. BACKGROUND

According to a June 12, 2011 article in the *El Paso Times*, Jaime Campos founded WKI, a farmworker employment agency designed to help farmers in southern New Mexico with a reported worker shortage that was negatively impacting their harvests. **[Doc 206-7, p. 11]** The article explained that WKI was in the process of becoming certified by the U.S. Department of Labor to obtain temporary work visas for Mexican farm laborers who could fill the need described by the farmers interviewed for the article. No representative from either Cervantes Defendant entity was quoted or mentioned in the article.

Mr. Campos testified in a deposition that the purpose of WKI was to get H-2A workers to serve New Mexico farms. **[Doc. 206-1, p. 6, 16:11-15]** Mr. Campos explained that the labor shortage was allowing farm laborers to take advantage of the farmers by working unpredictable hours, missing days of work, and even drinking beer on the job, but the farmers could not fire them because there was no one else to do the work. **[Doc. 206-1, p. 7, 19:14-20:7]** According to Mr. Campos, the lack of reliable workers sometimes led farmers to hire undocumented laborers instead. **[Doc. 206-1, p. 7, 18:17-20:7]** Mr. Campos knew of the H-2A visa program, which was designed to be a legal way to bring foreign laborers to the United States and which he believed would help both the farmers and the foreign laborers who wanted to come do the work in the United States. **[Doc. 206-1, p. 7, 18:24-19:11, 20:25-21:12]**

Mr. Campos explained in a deposition that in the beginning he contacted farmers to discuss their expectations for the following growing season. **[Doc. 206-1, p. 13, 42:5-17]** Mr. Campos stated that most farmers told him they were planning on growing smaller crops because they did not have a reliable labor force to do a full harvest. **[Doc. 206-1, p. 13, 42:5-17]** During his meetings with farmers, Mr. Campos explained that his plan was to apply for an H-2A visa for workers whom WKI would then outsource to the farmers. **[Doc. 206-1, p. 13, 43:20-23]** He also informed them that the ability to bring those workers was not guaranteed, but was subject to the approval of the U.S. Department of Labor. **[Doc. 206-1, p. 13, 44:21-45:17]** Mr. Campos estimates that he met with about ten farmers on behalf of WKI. **[Doc. 206-1, p. 14, 47:13-16]**

Representatives from five southern New Mexico farms signed agreements to accept workers from WKI. WKI used the same written Agreement of Outsourcing Support form, written by Mr. Campos, with each of the five farms that agreed to accept WKI laborers. **[Doc. 206-1, p. 22, 7:9-22]** Mr. Campos testified that he gave the same presentation to all the farmers,

during which he explained that he would seek H-2A workers and would include the signed Agreement in his application for those workers. **[Doc. 206-1, p. 22, 8:4-12; p. 23, 10:19-11:8]** Mr. Campos met with Dino Cervantes, the general manager of Cervantes Agribusiness and managing vice president of Cervantes Enterprises, on September 10, 2011 at Cervantes Enterprises' Vado, New Mexico office. **[Doc. 206-1, p. 51, 7:14-17; p. 53, 14:21-15:5]** When Mr. Cervantes was asked why he agreed to meet with Mr. Campos, Mr. Cervantes replied that "[Mr. Campos] was proposing a new business … involving foreign workers through the H-2A program, and it sounded interesting to me." **[Doc. 206-1, pp. 54-55, 21:20-22:3]** Mr. Campos testified that Mr. Cervantes did not tell him where to find labor, and Mr. Campos did not tell Mr. Cervantes that he was going to find that labor in any specific state. **[Doc. 206-1, p. 34, 77:18—p. 35, 78:6]** Mr. Campos did not ever speak with a representative of Cervantes Enterprises other than Dino Cervantes. **[Doc. 206-1, p. 35, 78:7-11]**

Mr. Cervantes signed the Agreement of Outsourcing Support to employ 15 agricultural workers from November 10, 2011 to March 9, 2012. **[Doc. 206-2, p. 1]** Mr. Campos testified that when he completed the Agreement of Outsourcing Support with Mr. Cervantes, he did not realize there was a distinction between Cervantes Enterprises and Cervantes Agribusiness. **[Doc. 206-1, p. 29, 51:12-52:6]** Mr. Campos filled in the name Cervantes Agribusiness on the form because that was the name on the business card he had from Mr. Cervantes. **[Doc. 206-1, p. 29, 52:16-23]** Plaintiffs point out that although the Agreement names only Cervantes Agribusiness, it provides the address for Cervantes Enterprises and a description of work done by Cervantes Enterprises ("Processing and Packing: Dry Red Chile and Other Spices"). **[Doc. 206-2, p. 1]** Plaintiffs also point out that on WKI's H-2A application to the U.S. Department of Labor, under

4

the heading "Locations and Directions to Work Site," Mr. Campos listed Cervantes Enterprises'

name and address. **[Doc. 206-2, p. 13]**

The Agreement of Outsourcing Support names as parties WKI Outsourcing and

Cervantes Agribusiness. **[Doc. 206-2, p. 1]** The Agreement states that it is "for services as a

work force provider," such work force consisting of "skilled farm labor workers; U.S. Citizens,

legal residents, or foreign workers with temporary working visas (H-2A)." **[Doc. 206-2, p. 1]**

The Agreement was effective from November 10, 2011 to March 9, 2012, under which WKI

would "provide 15 farm workers on a daily basis" and would be responsible for paying each of

those workers. **[Doc. 206-2, p. 1]** Under the Agreement the workers would be responsible for

"Processing & Packing: Dry Red Chile & Other Spices." **[Doc. 206-2, p. 1]** The Agreement was

signed and dated September 10, 2011 by Dino Cervantes and Jaime Campos. **[Doc. 206-2, p. 1]**

WKI's profits would be based on a rate of approximately one dollar for each hour of

labor one of its outsourced workers completed. **[Doc. 206-1, p. 15, 52:19-53:5]** The hourly wage

paid by the farmers would be based on the actual wage to be paid by WKI to the worker, plus

approximately one dollar, which WKI would keep to cover expenses. **[Doc. 206-1, p. 15, 52:19-**

**53:19]** WKI did not have the capital to pay workers itself, but was dependent on the funds paid

by farmers under each contract. **[Doc. 206-1, p. 16, 72:10-25]** Mr. Campos testified that the

farmers were aware of WKI's profit arrangement, whereby WKI would receive about one dollar

for every outsourced hour of labor. **[Doc. 206-1, p. 15, 53:12-18]**

Another farmer who signed an agreement with Mr. Campos was Ronnie Franzoy of RJF

Farms, with whom Mr. Campos met at least five times.[1] **[Doc. 206-1, p. 14, 48:16-17, 49:8-15]**

Mr. Franzoy testified that he preferred to hire Mexican laborers, and that his understanding was

---

[1] Ronnie Franzoy and RJF Farms are former defendants in this matter.  Plaintiffs voluntarily dismissed with
prejudice all claims against them. **[Doc. 148]**

Appendix 691

Mr. Campos would supply him with Mexican laborers; however Mr. Franzoy also stated that he had no intention of paying Mexican laborers a wage of approximately $10.00 per hour as envisioned under the H-2A program. **[Doc. 206-1, p. 76, 39:24-25; p. 78, 47:1-21]** Mr. Franzoy's understanding was that he would pay Mr. Campos $8.65 per hour of outsourced labor, with $7.50 going to the laborer and the remaining $1.15 to WKI. **[Doc. 206-1, p. 81, 74:22-25 – 75:1-14]** But Mr. Cervantes, when asked whether he planned on paying H-2A workers the statutorily fixed wage of $9.71 per hour of labor, replied that he and Mr. Campos discussed neither the laborers' nor Mr. Campos's wages. **[Doc. 206-1, p. 55, 24:15-25]**

In order to access foreign laborers through the federal H-2A visa program, an employer must apply with the Department of Labor for a certification that:

> **(A)** there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and
> **(B)** the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1). Mr. Campos understood this meant that WKI was required to hire every worker from the United States who applied before it would be allowed any H-2A foreign workers. **[Doc. 206-1, p. 8, 22:8-18]** WKI was also required to include in its application any agreements it made with the farmers, demonstrating the timeframe and number of workers needed. **[Doc. 206-1, p. 11, 35:3-22]** On September 30, 2011, Mr. Campos filed an application with the U.S. Department of Labor requesting certification to hire laborers under the H-2A visa program. **[Doc. 206-2, pp. 3-13]** In the application Mr. Campos represented that "[a]t this time, there are not sufficient workers who are able, willing or available at the time and place needed to perform the farm labor and services required by such farmers." **[Doc. 206-2, pg. 3]** The application listed five farms and packing companies in southern New Mexico as potential

6

worksites, including Cervantes Enterprises. **[Doc. 206-2, p. 13]** It also stated that the workers would be paid $9.71 per hour. **[Doc. 206-2, p. 8]** Mr. Campos included his agreements with the farmers, which he told the farmers in advance he would do. **[Doc. 206-1, p. 11, 35:3-22]** Federal law also required Mr. Campos to include the agreements with the farmers as part of the H-2A application. **[Doc. 206-1, p. 11, 35:12-12]** *See* 20 C.F.R. § 655.132(b)(4) (stating that an H-2A application must include "[c]opies of the fully-executed work contracts with each fixed-site agricultural business.") Mr. Campos also included ETA Form 790 that contained a detailed description of the job, worksite, and pay. **[Doc. 103-6]**

On October 7, 2011, a week after Mr. Campos filed the H-2A application, the Department of Labor sent a Notice of Deficiency to WKI, explaining that its application failed to meet certain criteria for acceptance. The Notice explained in detail those deficiencies and informed WKI that it could make modifications and resubmit its application within five business days. **[Doc. 206-2, pp. 14-21]** WKI remained in contact with the Department of Labor, and sent letters explaining some of the deficiencies and its efforts to complete a modified application on October 14, 2011 and October 18, 2011. **[Doc. 206-2, pp. 22-24]** On October 19, 2011, the Department received WKI's response to the Notice of Deficiency, which included a modified application for employment certification. **[Doc. 206-2, pp. 25-26]** On October 20, 2011, the Department of Labor sent a second Notice of Deficiency to WKI detailing further required modifications. **[Doc. 206-3, pp. 1-6]** WKI again submitted a modified application, which was received by the Department on November 1, 2011 and which requested that the application be immediately processed, due to the "emergency situation" and a projected start date of November 28, 2011. **[Doc. 206-3, pp. 7-10]** On November 4, 2011, the Department of Labor notified WKI

Appendix 693

that its application for certification under the H-2A program had been accepted for processing and outlined the requirements for final certification. **[Doc. 206-3, pp. 11-15]**

In order to receive certification under the H-2A program, WKI had to demonstrate that it worked with the State Workforce Agency to recruit intrastate workers and that it took additional recruitment steps on its own, including taking out newspaper advertisements. **[Doc. 206-3, pp. 11-15]** Mr. Campos worked with the Texas Workforce Commission ("TWC") to recruit U.S. workers. **[Doc. 206-1, p. 95, 14:22-24]** TWC did not interview prospective applicants – that was Mr. Campos's job – rather, TWC served as a sort of clearinghouse, where Mr. Campos could post information about available work and prospective applicants could learn about the job opportunities. **[Doc. 206-1, p. 88, 13:22-24; p. 95, 14:20-25-15:1]** TWC received from the Department of Labor ETA Form 790, the form that Mr. Campos submitted as part of his H-2A application. **[Doc. 206-1, p. 95, 14:22]** TWC provided prospective applicants a copy of ETA Form 790, which detailed the terms of WKI's employment offer. **[Doc. 206-1, p. 95, 14:22-23]** WKI was required to advertise the position with the $9.71 hourly wage rate listed in the application, and that rate would have to be paid to all workers who filled the positions, whether or not the employers ultimately hired foreign workers who required H-2A visas. **[Doc. 206-3, p. 12]** *See* 20 C.F.R. § 655.122(a). Mario Galvan, TWC's Migrant Seasonal Farm Worker Outreach Specialist, testified that an hourly wage of $9.71 attracted workers because it surpassed the local minimum hourly wage of $7.25. **[Doc. 206-1, p. 87, 9:6-9]**

Mr. Campos stated that TWC claimed it would provide WKI with the requisite amount of U.S. workers; however, he claimed that all he received were the workers' files from TWC, and most times the workers never showed up to do any work. **[Doc. 206-1, p. 8, 22:15-23]** Mr. Campos testified that WKI made all efforts to recruit workers that were required by the

Appendix 694

Department of Labor and the H-2A regulations. **[Doc. 206-1, p. 25, 20:20-21:16]** Emails between employees at TWC and the Department of Labor show that TWC employees were growing frustrated with Mr. Campos's perceived attempts to violate the rules by refusing to interview certain candidates and imposing requirements beyond what was outlined in WKI's application, such as requiring resumes, an imposition TWC construed as "deterring US workers from applying" despite TWC's determination that ample US workers were available to fill the jobs. **[Doc. 206-1, p. 103, 52:7-15; Doc. 206-4, pp. 30-35]**

Meanwhile, in mid-November Mr. Campos made presentations to prospective farm laborers about the H-2A visa program. On November 15 and 17, 2011, Mr. Campos gave presentations at Sin Fronteras to an audience of 40 people, including prospective applicants, about the H-2A program. **[Doc. 206-1, pp. 43-45, 49:18-54:1-15]** According to Mr. Campos, he did not recruit workers during the meetings, but instead presented general information about the H-2A visa program and WKI's role as a farm labor contractor. **[Doc 206-1, p. 54, 50:17-23]**

During this period Mr. Campos and WKI hired six Plaintiffs – Esteban Alfaro-Huitron, Eleazar Garcia-Mata, Jose Antonio Garcia-Mata, Juan Guzman, Enrique Rojas-Torres, and Lazaro Rojas-Torres – at the Centro de Trabajadores in El Paso, Texas. **[Doc. 206-7, pp. 21-28]** Four Plaintiffs testified in later affidavits that they signed work contracts with Mr. Campos to perform farm labor, and were told that when the work began, they should to go to a designated location in El Paso where they would be then be picked up and transported to the worksite locations in New Mexico. **[*Id.*]** Mr. Campos and WKI also hired three Plaintiffs, Raul Jasso-Cerda, Trinidad Santoyo-Garcia, and Pedro, who learned of WKI's job offer through TWC. **[Doc. 206-1, p. 88, 13:4-25-14:1-19]**

On November 14, 2011, the Department of Labor received information from WKI explaining its recruitment efforts, and again asking for immediate processing due to the emergency situation and approaching start date of November 28, 2011. **[Doc. 206-3, pp. 16-17]** That same day, the Department sent WKI a notice that its application had been partially certified because it had been determined that "a sufficient number of able, willing and qualified U.S. workers have not been identified as being available at the time and place needed to fill all of the job opportunities for which certification has been requested and that employment of the H-2A workers will not adversely affect the wages and working conditions of workers in the U.S. similarly employed." **[Doc. 206-3, pp. 18]**

On November 22, 2011, WKI sent an emergency request to the Department of Labor, seeking to delay or postpone the start date and period of employment for which it had been approved. **[Doc. 206-3, pp. 23-24]** The request stated that "the agricultural producers that WKI has contracted with to provide farm labor services have informed WKI that due to severe drought conditions at the places of employment, there is no work to be performed at this time." **[Doc. 206-3, p. 23]** Plaintiffs allege that the drought conditions had been ongoing and were not a new situation, and that the real reason Mr. Campos withdrew the application was that he realized there were too many qualified U.S. workers so he would not be able to access the guest laborers from Mexico. Plaintiffs claim that Mr. Campos and the farmers, including Dino Cervantes, wanted Mexican laborers because they believed they would work harder for less money, so when it became apparent that Mr. Campos would not be able to provide Mexican workers, he cancelled his application under the pretense of a drought. Mr. Cervantes ultimately relied on another contractor to provide laborers for the Cervantes entities.

All parties agree that Plaintiffs never talked to the Cervantes Defendants directly, but rather communicated only with WKI and Mr. Campos. However, Plaintiffs argue that Cervantes Defendants are still liable for their damages because Mr. Campos, as representative of WKI, was acting as the Cervantes Defendants' agent or co-conspirator. The Cervantes Defendants maintain that they are entitled to judgment as a matter of law on each of Plaintiffs' claims. Additional facts and arguments will be provided as needed in sections that follow.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986). A fact is considered material if it "might affect the outcome of the suit under the governing law." *Id*.  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmovant. *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)).

When, as here, "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Cassara v. DAC Serv., Inc*., 276 F.3d 1210, 1212 (10th Cir. 2002). The burden then shifts to the opposing party to come forward

Appendix 697

with admissible evidence to create a genuine issue of material fact on that element. *See Bacchus Indus., Inc. v. Arvin Indus., Inc*., 939 F.2d 887, 891 (10th Cir. 1991).

## B. **Plaintiffs' Breach of Contract Claims**

The Cervantes Defendants argue that there is no genuine dispute concerning their liability to Plaintiffs for breach of any contract. **[Doc. 185, pp. 6-14; Doc. 186, pp. 6-12]** First, Cervantes Agribusiness argues that the Agreement of Outsourcing Support signed by Jaime Campos and Dino Cervantes is not an enforceable contract, **[Doc. 185, p. 7]** and neither are the documents Plaintiffs cite in support of the existence of an employment contract between Plaintiffs and WKI. **[Doc. 185, pp. 9-10]** Cervantes Enterprises points out that it is not mentioned by name on any agreement with WKI [2], and it disputes that the documents cited by Plaintiffs support a contract between Plaintiffs and WKI show that there was any contractual relationship between Plaintiffs and Cervantes Enterprises. **[Doc. 186, pp. 8-9; 12]** Both Cervantes Defendants further argue that there is no evidence that they authorized Campos or WKI to act as an agent of either Cervantes entity such that they could be held liable for any actions taken by Campos or WKI. **[Doc. 185, pp. 9-12; Doc. 186, pp. 8-11]** Cervantes Agribusiness also argues that Plaintiffs cannot meet their burden of proof under a third-party liability theory because: (1) the Agreement of Outsourcing Support is not a contract between Cervantes Agribusiness and WKI; (2) even if

---

[2] There is no mention of Cervantes Enterprises in the Agreement; only Cervantes Agribusiness is named. However, Plaintiffs argue that the agreement also involved Cervantes Enterprises because the address provided is actually for Cervantes Enterprises, not Cervantes Agribusiness, and the type of work listed is "Processing & Packing: Dry Red Chile & Other Spices," which is a function of Cervantes Enterprises, not Cervantes Agribusiness. The Court does not decide whether both Cervantes Defendants are parties to the agreement, but instead considers this a fact over which there is a genuine dispute. For purposes of deciding the motion for summary judgment, however, the Court views the evidence in the light most favorable to the Plaintiffs, and will treat the Agreement as including both Cervantes Defendants. *See Adler*, 144 F.3d at 670 ("In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmovant.")

Appendix 698

there was a binding contract, there is no evidence that Plaintiffs were intended third party beneficiaries; and (3) even if Plaintiffs were third party beneficiaries of the contract, it was WKI that committed the breach, not Cervantes Agribusiness, so there would be no basis on which to hold Cervantes Agribusiness liable. **[Doc. 185, pp. 12-14]** Cervantes Enterprises argues that because it is not mentioned by name in any agreement with WKI, there is no contract under which it could be held liable for any damages to any third party beneficiary. **[Doc. 186; pp. 11-12]**

Plaintiffs' contract claim against the Cervantes Defendants presents two alternative theories of liability. **[Doc. 206, pp. 30-36]** Plaintiffs allege that the signed Agreement of Outsourcing Support was a contract between WKI and Dino Cervantes to recruit laborers for the Cervantes Defendant entities, which authorized Campos to act as an agent of Cervantes with regard to the recruitment. **[Doc. 206, pp. 30-34]** Thus, because Jaime Campos entered into employment contracts with Plaintiffs on behalf of the Cervantes Defendants as principals, the Cervantes Defendants can be held liable for the subsequent breach of those employment contracts. Alternatively, Plaintiffs claim that even without an agency relationship, they are entitled to recover under a breach of contract theory as third party beneficiaries of the Agreement of Outsourcing Support between WKI and Cervantes. **[Doc. 206, pp. 34-36]**

Because the Cervantes Defendants and Plaintiffs are not parties to the same agreement, and Plaintiffs' claims only survive if there is liability under an agency or third-party beneficiary theory, the Court begins its analysis of the contract claims by considering those alternative theories of liability.

1. ***Is there a genuine issue of material fact regarding WKI's possible agency relationship with either or both of the Cervantes Defendants?***

"An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair or does some service for the principal, with or without compensation." UJI 13-401 NMRA 2017. An agency agreement "may be oral or written, and may be either expressed or implied by a course of conduct showing an intention that the relationship exists." *Id*. An agency relationship does not arise until "the principal has in some manner indicated that the agent is to act for him, and that the agent so acts or agrees to act on his behalf and subject to his control." *San Juan Agr. Water Users Ass'n v. KNME-TV*, 2011-NMSC-011, ¶ 16, 150 N.M. 64, 257 P.3d 884, 889.  Once an agency relationship is created, a principal is generally liable for the actions of the agent when the agent was acting within the scope of the agent's employment and the principal had the right to control the manner in which the agent performed the action. UJI 13-402 NMRA 2017. "[A] principal's control over the agent is the key characteristic of an agency relationship." *Carlsberg Mgmt. Co. v. State Taxation & Revenue Dep't*, 1993-NMCA-121, ¶ 12, 116 N.M. 247, 250, 861 P.2d 288, 291.

There are, of course, situations in which one person engages another to do work without forming an agency relationship. "An independent contractor is one who agrees to do certain work where the person who engages the contractor may direct the result to be accomplished but does not have the right to control the manner in which the details of the work are to be performed." UJI 13-404 NMRA 2017. The person or entity who hires an independent contractor is generally not liable for the conduct of the contractor. *Id*. "Under an agency analysis, the principal's right to control the individual performing the work often distinguishes an employee [or agent] from an independent contractor," *Celaya v. Hall*, 2004-NMSC-005, ¶ 11, 135 N.M. 115, 118, 85 P.3d 239, 242. However, the right to control is only one among many factors to

14

consider, including: whether the hired party is engaged in a distinct business or occupation, whether the type of work is customarily done under the direction of the employer or without supervision, the skill level required by the type of work in question, which party provides the supplies and workplace used by the hired party to complete the work, the length of time of the employment, the manner of calculating payment, whether the work is part of the employer's regular business, the parties' belief that there is an agency relationship, and whether the principal is in business. Restatement (Second) of Agency § 220 (1958); *see also Celaya*, 2004-NMSC-005, ¶ 14 (recognizing the New Mexico Supreme Court's adopting of the Restatement (Second) of Agency approach).

The Cervantes Defendants argue that there is no evidence that they authorized WKI to act as their agent, exercised the right to control WKI's work, or otherwise acted in a manner consistent with the creation of an agency relationship. **[Doc. 185, p. 11; Doc. 186, p. 10]** Plaintiffs claim that there is sufficient evidence creating a genuine issue of fact concerning whether WKI was acting as an agent of the Cervantes Defendants at the time WKI recruited and entered into employment agreements with Plaintiffs. In support, Plaintiffs cite evidence that WKI advertised itself as a farm labor recruiting agency and that the Cervantes Defendants signed an agreement authorizing WKI to "recruit workers on its behalf." **[Doc. 206, p. 30]** Plaintiffs also point to the facts that Mr. Cervantes and Mr. Campos both testified that they signed the Agreement of Outsourcing Support in order to facilitate WKI's H-2A application and that federal law required WKI to obtain the Cervantes Defendants' consent as a condition of filing its H-2A application. **[Doc. 206, p. 30]** The Court will address Plaintiffs' specific arguments related to their contention that there is a genuine issue of material fact supporting a finding that the Cervantes Defendants retained the right to control the work of WKI.

First, Plaintiffs cite the fact that another farmer, Ronald Franzoy, stated that he would retain control over how WKI recruited workers under an identical Agreement of Outsourcing Support. **[Doc. 206, p. 32]** Mr. Franzoy did testify that he normally retains "control of the contractors in [his] fields," insofar as he reserves the right to tell a contractor to remove certain workers with whom he is not satisfied. **[Doc. 206-1, p. 75]** Mr. Franzoy also stated that he had directed Mr. Campos to recruit laborers from Mexico for his farm because he was only interested in having workers from Mexico, and he expected Mr. Campos to comply with that directive. **[Doc. 206-1, p. 82]** However, Mr. Franzoy's statements that he expected to maintain control of the workers in his fields and that he only wanted workers from Mexico does not show that he exercised control over the manner in which WKI recruited those workers. More importantly, the statements by Mr. Franzoy are not relevant evidence of the relationship between WKI and the Cervantes Defendants.

Plaintiffs argue that Mr. Franzoy's statements are relevant to the Cervantes Defendants because Mr. Campos stated that he treated all the growers, including the Cervantes Defendants, the same. **[Doc. 206, p. 33]** While the citations to Mr. Campos's testimony provided by Plaintiffs on this point do support the contention that all farmers were treated the same regarding the information they received from WKI and what they agreed to pay the workers, none of those record citations support the contention that the farmers had any control over WKI's recruiting process. **[*See* Doc. 206-1, pp. 13, 20, 22, 24]** In fact, only one of the listed record citations actually addresses control over WKI's recruitment process, and that evidence directly contradicts the proposition that the farmers had control. **[*See* Doc. 206-1, p. 20]** In that portion of his deposition, Mr. Campos states that "there was no control" and "it was the same– same process

16

for each customer regarding that." [*Id.*] Thus, this evidence does not support the argument that WKI was authorized to act as an agent of the Cervantes Defendants.

Plaintiffs also point out that Mr. Campos testified that he always recruited in the "best interest" of the growers, and he attempted to "do things the way farmers wanted." [**Doc. 206, p. 33**] Again, the Court notes that Mr. Campos also testified that the farmers did not have control over the recruiting process. Mr. Campos's statements that he acted in the farmers' best interest and tried to do what they wanted does not demonstrate that the farmers had control over the recruitment process. At best, this shows that Mr. Campos was mindful of the end result the farmers requested. However, where one party directs only the result to be accomplished, but not the manner in which it must be accomplished, there is no agency relationship. UJI 13-404 NMRA 2017. *Accord. Shaver v. Bell*, 1964-NMSC-255, ¶ 16, 74 N.M. 700, 704, 397 P.2d 723, 727 ("Where the employee is subject only to the control or direction of the employer as to the *result to be procured*, he is an independent contractor; if he is subject to the control of the employer as to the *means to be used in reaching that result*, he is an employee.") (emphasis added)). This evidence does not show that there was an agency relationship with regard to WKI's recruiting activities.

Plaintiffs also contend that the Cervantes Defendants exercised control based on the requirements of the federal H-2A program. Essentially, Plaintiffs' argument is that Mr. Cervantes knew that WKI was recruiting pursuant to the H-2A program and that the H-2A regulations dictated the manner in which WKI could recruit workers. Thus, Plaintiffs argue, the Cervantes Defendants exercised control over the recruiting by stipulating that it would be done in the manner required by the federal H-2A program. [**Doc. 206, p. 33**] The Court does not agree that Mr. Cervantes's knowledge that WKI would comply with a federal regulatory scheme

Appendix 703

supports the claim that the Cervantes Defendants had the right to control the manner in which WKI recruited laborers. Absent a specific requirement in the regulations giving the right to control recruitment to the farmers, the mere fact that WKI followed the law does not create an agency relationship.

Additionally, Plaintiffs argue that because WKI knew nothing about actual agricultural labor practices, WKI would lack the capacity to supervise farm workers, thereby making it necessary for the Cervantes Defendants to supervise all the workers hired by WKI. Plaintiffs believe this shows that the Cervantes Defendants would want some say in the quality of the workers hired, indicating that the Cervantes Defendants had control over the recruitment. **[Doc. 206, pp. 33-34]** However, the evidence presented by Plaintiffs does not support this theory. First, Plaintiffs have provided Mr. Campos's testimony that the farmers did not have control over the recruitment process. **[Doc. 206-1, p. 20]** Plaintiffs have also provided evidence that WKI was not allowed to vet the quality or skills of the workers, **[Doc. 206-1, p. 16]** and was required to offer a job to any available U.S. worker who applied before any foreign labor would be available. **[Doc. 206-5, p. 10]**  Accordingly, there is no evidence that the Cervantes Defendants could or did have control over which workers WKI would hire.

Finally, Plaintiffs contend that WKI was thoroughly financially dependent on the four growers, including the Cervantes Defendants, listed in the H-2A application because it had no assets or other customers.  Plaintiffs provide evidence that WKI did not have any other work to provide to potential employees, it had no other way to pay employees beyond its agreements with those farms, and it did not itself "decide when, what, or where work would be done." Plaintiffs contend that WKI's "economic reality" of dependence supports its agency argument based on a right to control. **[Doc. 206, p. 34]** Even if WKI was entirely financially dependent on

18

the Cervantes Defendants, that does not create an agency relationship absent a showing that the Cervantes Defendants had the right to control the manner in which WKI conducted its business of recruiting workers. The mere fact that the four growers were WKI's only clients does not vest in the Cervantes Defendants the right to control those recruitment activities.

Accordingly, the Court determines that the evidence presented does not create a genuine issue of material fact that would allow a reasonable fact finder to conclude that Jaime Campos or WKI were acting as authorized agents of Dino Cervantes, Cervantes Enterprises, or Cervantes Agribusiness. *See Anderson*, 477 U.S. at 248 (explaining that a fact is considered material only if it "might affect the outcome of the suit under the governing law"). There is no evidence specifically demonstrating that the Cervantes Defendants had the right to control the manner in which WKI recruited workers. *See San Juan Agr. Water Users,* 2011-NMSC-011, ¶ 16 (holding that there is no agency relationship absent an agreement that the agent will act on the principal's behalf and subject to the principal's control). Therefore, the motions for summary judgment on the breach of contract claims based on an agency theory shall be granted.

### 2. *Is there a genuine issue of material fact regarding Plaintiffs' status as third-party beneficiaries to the contract between WKI and either or both of the Cervantes Defendants?*

Generally, one who is not a party to a contract cannot sue to enforce that contract. *Fleet Mortg. Corp. v. Schuster*, 1991-NMSC-046, ¶ 4, 112 N.M. 48, 49–50, 811 P.2d 81, 82–83. An exception exists where the third party can demonstrate that the parties to the contract made the agreement with the intent of conferring a benefit on that third party. *Thompson v. Potter*, 2012-NMCA-014, ¶ 10, 268 P.3d 57, 61–62. A third party who derives only an incidental benefit from the contract will not have the right to enforce the contract. *Id*. That right is limited to situations in which "the contract is so expressed as to give the promisor reason to know that such benefit is

19

contemplated by the promisee as one of the motivating causes of his making the contract." *Permian Basin Inv. Corp. v. Lloyd*, 1957-NMSC-048, ¶ 22, 63 N.M. 1, 7, 312 P.2d 533, 537 (quoting Corbin on Contracts, Vol. 4, § 776, pp. 18, 19). The intent to benefit a third party can be demonstrated by either the contract itself or by evidence extrinsic to the contract showing that its provisions were in fact intended for that third party's benefit. *Valdez v. Cillessen & Son, Inc.*, 1987-NMSC-015, ¶ 34, 105 N.M. 575, 581, 734 P.2d 1258, 1264.

Plaintiffs claim they are intended third party beneficiaries of the Agreement of Outsourcing Support because the parties to the Agreement knew that the Agreement "would have provided a pecuniary benefit to a class of farm laborers that included Plaintiffs." **[Doc. 206, p. 35]** Plaintiffs further contend that the evidence shows that Dino Cervantes contracted with WKI as a favor to Jaime Campos, and that because Dino Cervantes knew that the laborers would be paid more through WKI than what Cervantes Agribusiness normally would have paid them, Cervantes Agribusiness "necessarily also intended to benefit WKI's workers." **[Doc. 206, p. 35]** Plaintiffs then refer to statements made by Campos and Ronnie Franzoy claiming those statements can fill in ambiguities in Dino Cervantes's intent concerning the signing of the Agreement. **[Doc. 206, p. 35]**

Even assuming the facts presented by Plaintiffs are true—that Dino Cervantes knew WKI's workers (Plaintiffs) would benefit from the Agreement, that Campos stated that he "needed" Mexican workers so his workers would receive the higher H-2A wage, and that Franzoy intended to benefit workers under the separate Agreement he signed with WKI—there is no evidence that Cervantes and WKI entered into the Agreement with the intent of conferring a benefit upon Plaintiffs. At most, the evidence provided by Plaintiffs shows that the parties to the agreement were aware that Plaintiffs would have been incidental third party beneficiaries of the

20

agreement. *See Woody Inv., LLC v. Sovereign Eagle, LLC*, 2015-NMCA-111, 362 P.3d 107,

115–16, *cert. denied* (Oct. 23, 2015) 2015-NMCERT-010, 369 P.3d 372 (holding that the

statement "I guess what I would say is I think this is a benefit to everybody involved" without

more evidence of intent rendered Plaintiffs, at best, incidental beneficiaries). The evidence does

not show that any benefit to the Plaintiffs was a "motivating cause" in making the contract, such

that they should be allowed to recover under the contract. *Permian Basin*, 1957-NMSC-048, ¶

22. Accordingly, summary judgment in favor of the Cervantes Defendants is appropriate with

respect to Plaintiffs contract claim based on third party beneficiary status.

Thus, there is no evidence giving rise to a genuine issue of material fact in support of

Plaintiffs' theories of contract recovery against the Cervantes Defendants for the acts of WKI

and Jaime Campos. Even assuming that Agreement of Outsourcing Support is an enforceable

contract, there is no legal mechanism by which Plaintiffs can enforce that Agreement against the

Cervantes Defendants. The Court will grant summary judgment in favor of the Cervantes

Defendants on Plaintiffs' claims for breach of contract.

### C. **Plaintiffs' AWPA Claims**

Plaintiffs bring four statutory claims under the Migrant and Seasonal Agricultural Worker

Protection Act, 29 U.S.C. §§ 1801-1854 (2016) ("AWPA" or "Act"). All nine Plaintiffs claim

that the Cervantes Defendants violated the Act's provisions relating to false information, 29

U.S.C. § 1821(f) and working arrangements, 29 U.S.C. § 1822(c). Six 2011 Plaintiffs – Esteban

Alfaro-Huitron, Eleazar Garcia-Mata, Jose Antonio Garcia-Mata, Juan Guzman, Enrique Rojas-

Torres, and Lazaro Rojas-Torres – assert an additional cause of action against the Cervantes

Defendants for violating the certificate of registration requirement of 29 U.S.C. § 1811. Lastly,

Plaintiff Enrique Rojas-Torres claims that the Cervantes Defendants violated 29 U.S.C. §

Appendix 707

1821(a) & (g) by failing to disclose information to him in Spanish. The Court notes that no decisions from the United States Court of Appeals for the Tenth Circuit have interpreted any of the four statutory provisions that Plaintiffs invoke.

The Cervantes Defendants' defense is that their liability as to these claims is extinguished by the intermediary roles of WKI and Mr. Campos, neither of whom acted as an authorized agent. Plaintiffs respond that their claims under the AWPA can survive summary judgment based on three theories: (1) the Act imposes displaces agency principles, and imposes direct liability on the Cervantes Defendants; (2) the Cervantes Defendants and WKI "jointly employed" the Plaintiffs, thereby making them responsible for WKI's alleged violations of the Act; and (3) Mr. Campos's and WKI's alleged maltreatment of Plaintiffs occurred in an agency capacity attributable to the Cervantes Defendants.

Because the Court has already determined that Mr. Campos and WKI were not agents of Dino Cervantes or the Cervantes Defendants, the Court rejects Plaintiffs' third theory of liability – that the Cervantes Defendants are liable under the Act based on common law agency principles. At this point, the Court considers Plaintiffs' first and second theories of liability: whether the Act imposes direct liability on the Cervantes Defendants because of their agricultural employer status, and whether the Cervantes Defendants and WKI jointly employed Plaintiffs.

### 1.  Law Regarding the AWPA

In 1983, Congress enacted the AWPA "to remove the restraints on commerce caused by activities detrimental to migrant and seasonal agricultural workers ... and to assure necessary protections for migrant and seasonal agricultural workers...." 29 U.S.C. § 1801 (2016). The AWPA prohibits, among other things, "agricultural employers" from making false and

Appendix 708

misleading representations concerning employment policies and from breaching labor contracts.

It also requires agricultural employers to provide written disclosures in a worker's language of

working conditions, and to register with the government. *Id.*  §§ 1811–44. Under the AWPA, the

term agricultural employer means "any person who owns or operates a farm, ranch, processing

establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and

who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal

agricultural worker." *Id.* § 1802(2).[3] If an employer fails to adhere to any of the provisions in the

AWPA the statute creates a private right of action in federal court on behalf of all aggrieved

persons. *Id.* § 1854(a). The Act empowers district courts to impose actual damages or statutory

damages of $500 per plaintiff per violation. *Id.* § 1854(c).

For purposes of the AWPA, the term "employ" has the same definition as that used in the

Fair Labor Standards Act. *Id.* § 1802(5). "'Employ' includes to suffer or permit to work." 29

U.S.C. § 203(g) (2016). The AWPA concept of "employ" also "includes the joint employment

principles applicable under the [FLSA]" 29 C.F.R. § 500.20(h)(5) (2017). The regulations

promulgated under the AWPA define "joint employment" as "a condition in which a single

individual stands in the relation of an employee to two or more persons at the same time." *Id.*

In applying the joint employment test, "the ultimate question to be determined is the

economic reality – whether the worker is so economically dependent upon the agricultural

employer/association as to be considered its employee." *Id.* § 500.20(h)(5)(iii). "[T]he joint

---

[3] Cervantes Agribusiness does not dispute that it is an "agricultural employer," and thus subject to the Act. Cervantes Enterprises does dispute that it is an agricultural employer, suggesting that the Act does not apply to it because it "farms no land and employs no seasonal farm workers." **[Doc. 186, p. 13]** However, the Act considers a "packing shed" an agricultural employer. *See* 29 U.S.C. § 1802. Plaintiffs have put forward sufficient evidence that Cervantes Enterprises is a packing shed, including the Agreement of Outsourcing that describes Cervantes Enterprises' work as "Processing and Packing: Dry Red Chile and Other Spices." Accordingly, the Court determines as a matter of law that Cervantes Enterprises qualifies as an agricultural employer under the AWPA. *See Arredondo v. Delano Farms Co.*, 922 F. Supp. 2d 1071, 1075 (E.D. Cali. 2013) (under the AWPA "[t]he ultimate question of whether a defendant is an 'employer' is a legal question.")

employment analysis focuses on the relationship between the agricultural employer/association and the *worker*." *Arredondo*, 922 F. Supp. 2d at 1083 (emphasis in original). "If, as a matter of economic reality, a laborer is dependent upon the [farm labor contractor] and the agricultural employer, then a joint employment relationship exists, and the laborer will be considered an employee of both entities." *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1208 (11th Cir. 2003). But if two entities "are completely disassociated with respect to the employment of a particular employee, a joint employment situation does not exist." 29 C.F.R. § 500.20(h)(5). In determining the joint employment test, court looks to the following regulatory factors codified in § 500.20(h)(iv)(A)-(G):

> **(A)** Whether the agricultural employer/association has the power, either alone or through control of the farm labor contractor to direct, control, or supervise the worker(s) or the work performed (such control may be either direct or indirect, taking into account the nature of the work performed and a reasonable degree of contract performance oversight and coordination with third parties);
> **(B)** Whether the agricultural employer/association has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker(s);
> **(C)** The degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue;
> **(D)** The extent to which the services rendered by the worker(s) are repetitive, rote tasks requiring skills which are acquired with relatively little training;
> **(E)** Whether the activities performed by the worker(s) are an integral part of the overall business operation of the agricultural employer/association;
> **(F)** Whether the work is performed on the agricultural employer/association's premises, rather than on premises owned or controlled by another business entity; and
> **(G)** Whether the agricultural employer/association undertakes responsibilities in relation to the worker(s) which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

Appendix 710

Plaintiffs argue, in a footnote, that the Cervantes Defendants and WKI jointly employed them. As a consequence, Plaintiffs assert that the Cervantes Defendants are liable for every violation of the Act that WKI and Mr. Campos committed. However, Plaintiffs provided virtually no analysis of the factors bearing on the existence of a joint employment relationship, even though it was their burden to do so. *See Martinez-Mendoza*, 340 F.3d at 1209 ("[b]ecause the laborer has the burden of proof, to prevail he must establish the joint-employment inference by a preponderance of the evidence.") Plaintiffs did not even cite – let alone analyze – the seven regulatory factors enumerated above. Establishing a joint employment inference requires exposition and analysis. *See id.* 340 F.3d at 1207-15; *Arredondo*, 922 F. Supp. 2d at 1083-89; *Fanette v. Steven Davis Farms, LLC*, 28 F. Supp. 3d 1243, 1256-61 (N.D. Fla. 2014). In this case, because Plaintiffs inadequately briefed the joint employment issue, the Court is bereft of necessary facts, law, and argument needed to resolve whether the Cervantes Defendants are liable to Plaintiffs for WKI's alleged violations of the Act under that theory. The Court thus does not consider the Cervantes Defendants' liability under the joint employment doctrine.

**2. Analysis**

### a. *Plaintiffs' claim brought under 29 U.S.C. § 1821(f)*

Plaintiffs' first statutory claim, brought under 29 U.S.C. § 1821(f), imposes on agricultural employers certain disclosure requirements. It applies to each "farm labor contractor" and "agricultural employer" "which recruits any migrant agricultural worker" to "ascertain and disclose in writing to each such worker who is recruited for employment" certain information "at the time of the worker's recruitment." 29 U.S.C. § 1821(a). Section 1821 "was purposefully engineered to grant each and every worker an independent and individual right to receive a written ratification of all of the material terms and conditions of employment and to be

Appendix 711

intelligibly and comprehensively appraised of his or her prospective working arrangements." *Villalobos v. North Carolina Grower's Ass'n Inc.,* 252 F. Supp. 2d 1, 9 (D.P.R. 2002) (citing *Bueno v. Mattner,* 829 F.2d 1380, 1384 (6th Cir.1987)). "[D]isclosure requirements cannot be satisfied by simply publishing or disseminating varying, inaccurate, and/or confusing terms and conditions, leaving the worker to guess which terms are applicable and correct." *Villalobos*, 252 F. Supp. 2d at 10. Required disclosures include information related to the place of employment, wages, crops and kinds of activities on which the worker may be employed, period of employment, and whether transportation, housing and any other employer sponsored benefits are provided. *See* § 1821(a)-(d). An agricultural employer that "knowingly" provides "false or misleading information" concerning these things is subject to liability. *Id.* § 1821(f).

The Cervantes Defendants' liability under this section depends on whether they "recruited" Plaintiffs. The definition of "recruit" is not defined by the Act or by binding precedent. However, the legislative history of the Act indicates that the term is given a broad reading, stating that "[t]he activity envisioned by the Committee" in defining the term "recruit" "runs the spectrum from the actual pre-employment discussion between the recruiter and the migrant worker to the filing of job orders with the interstate recruitment system." H.R. Rep. No. 885, at 13 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 4559.

Citing this legislative history, courts have given the term recruit an expansive meaning to include "all pre-employment discussions relating to the employment and for the purposes of obtaining or otherwise securing the services of a migrant agricultural worker, which occur where the worker cannot readily observe the conditions of the employment." *Montalvo v. Larchmont Farms, Inc.*, Civ. No. 06-2701 (RBK/AMD), 2009 WL 4573279 *10 (D.N.J. Dec. 3, 2009). This includes indirect communication – that is, communication between farmers and workers that

takes place through a middleman. *See Escobar v. Baker*, 814 F. Supp. 1491, 1504 (W.D. Wash. 1993) ("'Recruiting' encompasses not only direct contacts with prospective workers but also indirect efforts to attract or solicit workers for agricultural employment.") Under this expansive reading of the term "recruit," the Court believes that the Cervantes Defendants "recruited" Plaintiffs, thereby making them subjects of the Act. Consequently, the Act imposes direct liability on the Cervantes Defendants for any alleged misleading disclosures made to Plaintiffs at the time WKI recruited them.

However, nothing in the record indicates that Plaintiffs were given misleading disclosures. All Plaintiffs, except allegedly for Plaintiff Enrique Rojas-Torres, received written job offers (ETA Form 790) from WKI. ETA Form 790 includes all the information that it must legally contain. For example, it provides information about the place of employment, the hourly wage, the job specification and duration, information regarding transportation and housing, the worksite locations, and whether workers' compensation is afforded. No record evidence suggests, nor do Plaintiffs argue, that these disclosures were misleading on their face. Thus, at the time of recruitment, Plaintiffs received accurate disclosures. This fact alone may be sufficient to award summary judgment to the Cervantes Defendants. *See Reyes v. Remington Hybrid Seed Co., Inc.,* 495 F.3d 403, 410 (7th Cir. 2007) (summary judgment granted on claim that defendant's violated AWPA's posting requirement where defendant "posted everything the law requires.")

Plaintiffs argue, however, that ETA Form 790 and its offer of jobs were illusory. In essence, Plaintiffs claim that by facilitating WKI's H-2A application, the Cervantes Defendants falsely promised to hire Plaintiffs, who were U.S. workers, and to pay them the H-2A wage. As support for Plaintiffs' contention that the Cervantes Defendants had no true intention of hiring

Appendix 713

U.S. workers, Plaintiffs rely on a number of Mr. Cervantes's deposition statements in which he indicated that he thought the purpose of his partnership with WKI was to obtain foreign workers, and that he partnered with WKI for that purpose. Mr. Cervantes testified that he was unaware of the H-2A visa program's requirement that U.S. workers be recruited before foreign workers, and that unless Mr. Campos was "brining in foreign workers," he had no use for Mr. Campos's services, since he already employed farm labor contracts that could provide him domestic laborers. **[Doc. 206-1, p. 57, 31:13-18; 32:2-3]** Plaintiffs believe that this and similar statements by Mr. Cervantes are evidence that Mr. Cervantes misled them to believe they would be hired, which ultimately did not occur.

However, Mr. Cervantes's misunderstanding or ignorance about the H-2A program's conditions is not evidence that he provided Plaintiffs misleading written disclosures, which is what 29 U.S.C. § 1821 regulates. A review of the case law in this area indicates that § 1821 is violated when an employer, for example, fails to make disclosures entirely, *see Bueno v. Mattner*, 633 F.Supp.1446, 1464 (W.D. Mich. 1986), or misstates such disclosures, *see Washington v. Miller*, 721 F2d 797 (11th Cir. 1983). Here, Plaintiffs actually received accurate written disclosures regarding the terms of their employment, including accurate disclosures relating to pay, worksite location, transportation and housing, etc. Mr. Cervantes's statements that he partnered with WKI to employ foreign laborers – an event that is indeed contemplated by the H-2A program under certain conditions – does not imply that he misled Plaintiffs about the existence of jobs. Thus, there is no genuine issue of material fact regarding whether Plaintiffs received misleading disclosures.

Plaintiffs also allege that the Cervantes Defendants never truly planned to pay them the H-2A wage based on Mr. Cervantes's statement that he and Mr. Campos "never discussed"

Appendix 714

wages during their meeting. **[Doc. 206-1, p. 15]** The Court is unpersuaded that Mr. Cervantes's statement that he and Mr. Campos "never discussed" wages is akin to concocting a plan to not pay those wages. Plaintiffs further suggest that since Mr. Cervantes never paid his workers more than $7.50 per hour, he had no intention of paying the H-2A wage of $9.71 per hour. But this suggestion is not supported by the record. In fact, the record citations Plaintiffs point to belie this suggestion, revealing instead that Mr. Cervantes would at times pay his farm labor contractor up to $9.50 per hour of labor. **[Doc. 206-1, p. 56, 29:13-15]** Accordingly, the Court determines that the evidence presented as to Mr. Cervantes's alleged intent to not pay the H-2A wage does not create a genuine issue of material fact that would allow a reasonable fact finder to conclude as such.

In sum, nothing in ETA Form 790 indicates that the disclosures were themselves misleading or illusory. Because there is no evidence giving rise to a genuine issue of material fact in support of Plaintiffs' theory that the Cervantes Defendants provided them false or misleading disclosures in contravention of 29 U.S.C. § 1821(f), the Court will therefore grant summary judgment in favor of the Cervantes Defendants on Plaintiffs' claims for breach of that provision.

**b. _Plaintiff Enrique Rojas-Torres's claim brought under 29 U.S.C. § 1821(g)_**

Plaintiff Enrique Rojas-Torres individually brings a claim against the Cervantes Defendants for failing to provide him the written disclosures described above, and to provide those disclosures in his native language, Spanish. 29 U.S.C. § 1821(g) provides that "[t]he information required to be disclosed by [29 U.S.C. § 1821(a)-(c)] … shall be provided in written form. Such information shall be provided in English or as necessary and reasonable, in Spanish

or other language common to migrant agricultural workers who are not fluent or literate in English."

Summary judgment on this claim must be granted in favor of the Cervantes Defendants, because Plaintiffs provided no record evidence whatsoever that Mr. Rojas-Torres failed to receive disclosures in Spanish. There is no testimony from Mr. Rojas-Torres, nor any reference to discovery material, affidavits, declarations, or the like, to support this allegation. Because Plaintiffs presented no evidentiary support for Mr. Torres-Rojas's claim, summary judgment in favor of the Cervantes Defendants is granted.

### c. *Plaintiffs' claim brought under 29 U.S.C. § 1822*

29 U.S.C. § 1822(c) provides that "[n]o farm labor contractor, agricultural employer, … shall, without justification, violate the terms of any working arrangement made by that contractor, employer, or association with any migrant agricultural worker."

The Court must first examine whether the Cervantes Defendants properly sought summary judgment on this claim. In their motions, both Cervantes Enterprises and Cervantes Agribusiness failed to expressly identify Plaintiffs' claim under 29 U.S.C. § 1822 as one for which they expressly sought summary judgment. Plaintiffs even flagged this omission in their Response brief, but neither Cervantes Defendant took corrective action. Even though the Cervantes Defendants' briefs did seek summary judgment "as to all claims," the Court is concerned that this broad request may defeat Rule 56's requirement that the Cervantes Defendants spell out, or "identify" the exact relief sought. *See* Fed. R. Civ. P. 56.

The Court therefore provides the Cervantes Defendants leave to file a motion for summary judgment on Plaintiffs' claim brought under § 1822. If the Cervantes Defendants do not file a motion, the Court will assume that this claim remains active. The Cervantes

Appendix 716

Defendants' filings shall be made jointly, and any motion is due within 14 days of entry of this Memorandum Opinion and Order.

### d. *Plaintiffs' claim brought under 29 U.S.C. § 1811*

29 U.S.C. § 1811 requires farm labor contractors and those that the contractor hire to obtain certificates of registration from the Department of Labor to carry out "farm labor contracting activity." By its plain terms, the statute's four provisions apply to farm labor contractors. *See* § 1811(a) ("No person shall engage in farm labor contracting activity…"); § 1811(b) ("A farm labor contractor shall not hire, employ, or use any individual to perform farm labor contracting activities …"); § 1811(c) ("Each registered farm labor contractor … shall carry at all times … a certificate of registration…"); § 1811(d) ("The facilities and services … shall be denied to any farm labor contractor upon refusal … to produce, … a certificate of registration.")

Plaintiffs allege that the Cervantes Defendants are directly liable under this provision for WKI's use of unregistered labor recruiters. However, the statute plainly applies to "farm labor contractors," which the Cervantes Defendants are not. *See Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 592 (W.D. Tex. 1999) ("[t]he AWPA … distinguish[es] between areas in which an agricultural employer can be found automatically liable for a farm contractor's action, and those instances in which it cannot.") In their Response brief, Plaintiffs shifted the statutory focus, claiming that the Cervantes Defendants violated another statutory provision by not verifying Mr. Campos's certificate of registration. *See* 29 U.S.C. § 1842 (stating that "[n]o person shall utilize the services of any farm labor contractor … unless the person first takes reasonable steps to determine that the farm labor contractor possesses a certificate of registration which is valid ….") Although this provision would appear to directly apply to the Cervantes Defendants, Plaintiffs did not plead this theory of liability in their Complaint, and the Court will

not consider it now. *See Evans v. McDonald's Corp.*, 936 F.2d 1087, 1091 (10th Cir. 1991)

("claim raised not in amended complaint but, rather, in plaintiff's response to defendant's motion

for summary judgment was not properly before district court.") Because 29 U.S.C. § 1811 speaks

to farm laborers rather than agricultural employers, the Court grants summary judgment on this

claim in their favor.

### D.  Plaintiffs' Fraud Claim

Under New Mexico law, a claim of fraud requires proof of: "(1) a misrepresentation of

fact, (2) either knowledge of the falsity of the representation or recklessness on the part of the

party making the misrepresentation, (3) intent to deceive and to induce reliance on the

misrepresentation, and (4) detrimental reliance on the misrepresentation." *Williams v. Stewart*,

2005-NMCA-061, ¶ 34, 137 N.M. 420, 429, 112 P.3d 281, 290.  Fraud must be established by

clear and convincing evidence. *See Snell v. Cornehl*, 1970-NMSC-029, ¶ 7, 81 N.M. 248, 249,

466 P.2d 94, 95. The Court agrees with Plaintiffs that their claim for fraud does not require an

analysis of whether WKI was acting in an agency capacity. *See Gouveia v. Citicorp Person-to-*

*Person Fin. Ctr., Inc*. 1984-NMCA-079, ¶ 13, 101 N.M., 572, 577, 686 P.2d 262, 267 (stating

that "[m]isrepresentations made indirectly to an injured party can serve as the basis for an action

for fraud.")

Defendants argue that they are entitled to summary judgment on Plaintiffs' fraud claims

because they never directly communicated any false or misleading information to Plaintiffs, nor

did they have an agency relationship with WKI such that its statements would be attributable to

the Cervantes Defendants. **[Doc. 185, p. 15; Doc. 186, p. 14]** Plaintiffs argue that because Dino

Cervantes signed the Agreement of Outsourcing Support, which WKI needed to file its H-2A

application, with the knowledge that it contained misrepresentations, this element is satisfied.

According to Plaintiffs, at the time Mr. Campos submitted the H-2A application, it contained the following misrepresentations: (1) the farmers lacked access to a sufficient number of U.S. workers; (2) the farmers promised to hire U.S. workers; and (3) the farmers never agreed to pay the H-2A wage. **[Doc. 206, p. 37]** According to Plaintiffs, since Mr. Cervantes signed the Agreement knowing it would be part of WKI's H-2A application, the Cervantes Defendants "knew or should have known that their action would cause" misrepresentations to be made to Plaintiffs. **[*Id.*]**

None of Plaintiffs' record citations lead to the conclusion, by clear and convincing evidence, that Mr. Cervantes made misrepresentations to Plaintiffs or that he knew of any such alleged misrepresentations. As to Plaintiffs' contention that Mr. Cervantes never agreed to pay the H-2A wage, suggesting this is evidence that he misrepresented to Plaintiffs the wage terms of their employment, the Court has already explained, *supra*, pp. 28-9, that Plaintiffs' record citations do not factually or legally support this contention. Turning to Plaintiffs' record support for their assertion that the Cervantes Defendants did not experience a domestic labor shortage, this evidence is culled from the testimony of Jesus Maldonado, a farm labor contractor employed by Mr. Cervantes, and not from testimony by Mr. Cervantes himself. It is therefore not evidence revealing Mr. Cervantes's knowledge. *See Gouveia,* 1984-NMCA-079, ¶ 13 (defendant is liable for fraud based on his own "actual knowledge" of misrepresentation).

Mr. Cervantes never testified that he "hired WKI specifically to access Mexican workers," as Plaintiffs assert. Rather, he testified that Mr. Campos's business proposal "interested" him because it involved acquiring foreign laborers. Mr. Cervantes's interest in a federal work visa program that indeed envisions employing foreign laborers under certain circumstances is not evidence of a misrepresentation of fact made to Plaintiffs regarding the

Appendix 719

existence of jobs. For fraud to be actionable, New Mexico law requires a real misrepresentation of fact – for example, a contractor's statement to a homeowner that a certain land use is permitted when he knows it is prohibited. *See Kaveny v. MDA Enterprises, Inc.*, 2005-NMCA-118, ¶ 11, 138 N.M. 432, 435, 120 P.3d 854. Beyond pointing to Mr. Cervantes's deposition statements that he was interested in partnering with WKI to participate in a federal work visa program, Plaintiffs submitted no material evidence suggesting that Mr. Cervantes misrepresented that he would hire or pay Plaintiffs.

Because Plaintiffs have failed to show that the Cervantes Defendants misrepresented information, the Court need not examine whether Plaintiffs can prove the other elements of fraud. *See Sauter v. St. Michael's College*, 1962-NMSC-107, ¶ 9, 70 N.M. 380, 385, 374 P.2d 134, 138 (to prevail on fraud claim plaintiff must show that each element of the claim is satisfied). Thus, the Court will grant summary judgment in favor of the Cervantes Defendants on Plaintiffs' fraud claim.

### E.  **Plaintiffs' Conspiracy Claim**

To prevail on a claim for civil conspiracy, Plaintiffs must show: "(1) that a conspiracy between two or more individuals existed[,] (2) that specific wrongful acts were carried out by [Defendants] pursuant to the conspiracy[,] and (3) that [Plaintiffs were] damaged as a result of such acts." *Cain v. Champion Window Co. of Albuquerque, LLC*, 2007-NMCA-085, ¶ 28, 142 N.M. 209, 217, 164 P.3d 90, 98. P.3d 440. "A civil conspiracy by itself is not actionable, nor does it provide an independent basis for liability unless a civil action in damages would lie against one of the conspirators. A civil conspiracy must actually involve an independent, unlawful act that causes harm—something that would give rise to a civil action on its own." *Ettenson v. Burke*, 2001-NMCA-003, ¶ 12, 130 N.M. 67, 72, 17 P.3d 440, 446. Thus, a plaintiff

"cannot recover on a claim for civil conspiracy unless [the plaintiff] can recover against at least one of the conspirators for a specific wrongful act beyond the conspiracy itself." *Cain,* 2007-NMCA-085, ¶ 28. "[A] conspiracy claim fails as a matter of law when no actionable civil case exists against the defendants." *Vigil v. Public Service Co. of N.M.*, 2004-NMCA-085, ¶ 20, 136 N.M. 70, 74, 94 P.3d 813 817.

The Cervantes Defendants argue that there is no genuine dispute concerning their liability to Plaintiffs for conspiring with WKI and the other defendants to evade the requirements of the H-2A visa program. Cervantes Enterprises argues that Mr. Campos erroneously listed Cervantes Enterprises' address as a worksite location as part of its H-2A application, but that this erroneous designation should not be construed as a contract between it and Plaintiffs that Cervantes Enterprises attempted to evade. **[Doc. 186, pp. 16-17]** Both Cervantes Defendants argue that they had no communications with any of the other grower defendants, and that they never assisted or participated in WKI's H-2A application filing.[4] **[Doc. 185, pp. 17-18; Doc. 186, pp. 15-16]**

Plaintiffs argue that Mr. Campos's defrauding of Plaintiffs about the existence of jobs is attributable to the Cervantes Defendants in a coconspirator capacity. **[Doc. 206, pp. 42-43]** Plaintiffs also argue that the Cervantes Defendants and WKI conspired to evade the H-2A program's requirements that U.S. workers be given employment priority over foreign workers. Plaintiffs believe that the Cervantes Defendants had no rational business reason to partner with WKI, an untested business and without its own assets, unless the reward was to acquire foreign

---

[4] The Cervantes Defendants contend that Plaintiffs should be sanctioned under Fed. R. Civ. P. 11 for pleading their civil conspiracy claim because it supposedly lacks evidentiary support. Because this request is meritless, and because the Cervantes Defendants did not follow the 21-day "safe harbor" rule, the Cervantes Defendants' request for sanctions is denied. *See Mellott v. MSN Communications, Inc.*, 492 Fed. Appx. 887, 888 (10th Cir. 2012) ("the 'safe-harbor' provision of Rule 11(c)(2) requires a party to serve a copy of its Rule 11 motion on the other party and to give that party an opportunity (generally 21 days) to withdraw or correct the challenged document before filing the sanctions motion with the court.")

laborers. **[Doc. 206, pp. 44-45]** Plaintiffs also allege that despite WKI's pledge in its H-2A application to hire U.S. workers over foreign workers, Mr. Cervantes contradicted this by stating that he partnered with WKI to obtain foreign H-2A workers, and that the Agreement of Outsourcing Support signed by Mr. Cervantes and Mr. Campos is deliberately vague, suggesting that these facts are further evidence of WKI's and the Cervantes Defendants' attempts to evade the H-2A program's requirements. **[*Id.*]** Finally, Plaintiffs contend that Mr. Campos took "an overt act in furtherance of the conspiracy" by filing the H-2A application that listed Cervantes Enterprises' address as a worksite location. **[Doc. 206, p. 47]**

The Court need not reach the question of whether Plaintiffs have presented sufficient facts to show that a conspiracy existed. In light of the Court's holding that no genuine issues of material fact support their breach of contract, AWPA, and fraud claims, Plaintiffs civil conspiracy claims fail as a matter of law. *See Vigil,* 2004-NMCA-085, ¶ 20. Thus the Court grants summary judgment in the Cervantes' Defendants favor on Plaintiffs' civil conspiracy claim.

**IT IS THEREFORE ORDERED** that

1. Defendant Cervantes Agribusiness' Motion for Summary Judgment **[Doc. 185]** is **GRANTED**.

2. Defendant Cervantes Enterprises' Motion for Summary Judgment **[Doc. 186]** is **GRANTED**.

3. The Cervantes Defendants' Motion for Partial Summary Judgment **[Doc. 208]** is **GRANTED**.

Appendix 722

**IT IS ALSO ORDERDED** that the Cervantes Defendants shall have leave to file a

motion for summary judgment on Plaintiffs' claim brought under 29 U.S.C. § 1822. If the

Cervantes Defendants do not file a motion, the Court will assume that this claim remains active.

The Cervantes Defendants' filings shall be made jointly, and any motion for summary judgment

is due within **14 days** of entry of this Memorandum Opinion and Order.


_____
UNITED STATES DISTRICT COURT JUDGE

Appendix 723

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ESTEBAN ALFARO-HUITRON,
ELEAZAR GARCIA-MATA,
JOSE ANTONIO GARCIA-MATA,
JUAN GUZMAN, JOSE GERARDO JASSO,
RAUL JASSO-CERDA, ISMAEL MARTINEZ
GONZALEZ, ENRIQUE ROJAS-TORRES,
LAZARO ROJAS-TORRES,
TRINIDAD SANTOYO-GARCIA
PEDRO TAMEZ, ANGELA TREJO,
EFRAIN TREJO, SANTOS TREJO,
and YANETH TREJO,

                                                              No. 2:15-cv-00210-JCH-JHR

     Plaintiffs,

v.

WKI OUTSOURCING SOLUTIONS, LLC,
JAIME CAMPOS, CERVANTES AGRIBUSINESS,
CERVANTES ENTERPRISES, INC.,
RJF FARMS, INC., RONNIE J. FRANZOY,
TIERRA DE DIOS FARMS, LLC, RIO VALLEY CHILI
INC., LACK FARMS, INC. and SKYLINE PRODUCE, LLC

     Defendants.

### MEMORANDUM OPINION AND ORDER GRANTING THE CERVANTES DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

     This matter is before the Court on Defendants Cervantes Agribusiness' and Cervantes

Enterprises, Inc.'s ("Cervantes Defendants") joint Motion for Summary Judgment [ECF No.

233]. Plaintiffs[1] are United States citizens or lawful permanent residents who were given hiring

priority through the federal H-2A program to provide manual labor on fields and land owned by

---

[1] Only nine Plaintiffs are involved in the instant matter: Esteban Alfaro-Huitron, Eleazar Garcia-Mata, Jose Antonio Garcia-Mata, Juan Guzman, Enrique Rojas-Torres, Lazaro Rojas-Torres, Raul Jasso-Cerda, Trinidad Santoyo-Garcia, and Pedro Tamez.

the Cervantes Defendants during the 2011-2012 harvest seasons. The farm labor contractor who recruited and hired Plaintiffs – Defendants WKI Outsourcing Solutions, LLC ("WKI") and its owner Jaime Campos – never actually furnished Plaintiffs to work for the Cervantes Defendants. Citing a drought, Campos cancelled Plaintiffs' work contracts at the last minute. Plaintiffs allege there was no such unusual drought; the real reason Campos cancelled their contracts was because he realized there were too many qualified U.S. workers, so he would not be able to access foreign laborers from Mexico, which was Defendants' alleged goal all along.

Based on the theory that the Cervantes Defendants and WKI "jointly employed" Plaintiffs, they sued the Cervantes Defendants under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801-1854 ("AWPA") contending, among other things, that they were equally liable for WKI's cancellation of their work contracts. After carefully considering the motion, briefs, and relevant law, the Court concludes that the Cervantes Defendants' motion should be granted because they did not jointly employ Plaintiffs.

## I.    FACTUAL BACKGROUND

Most of the facts necessary to resolve the pending motion for summary judgment are set forth in the Court's Memorandum Opinion and Order previously granting summary judgment to the Cervantes Defendants, which are either undisputed or construed in the light most favorable to Plaintiffs as the non-movants. *See* Mem. Op. and Order 1-11, ECF No. 232 ("Order"). The Court need not repeat those facts herein but adopts them by reference for the purposes of resolving the motion for summary judgment and presents the following additional material facts.

## A.    The H-2A Program

Under the H-2A program, WKI had to give hiring priority to domestic, or "U.S. workers" like Plaintiffs before petitioning for foreign workers. An employer like WKI could hire foreign

guest laborers under the H-2A visa program only if it could certify that "there are not sufficient workers who are able, willing, and qualified" to perform the work and employing foreign workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed" 8 U.S.C § 1188(a)(1). An agricultural employer or its agent works with the State Workforce Agency to recruit U.S. workers on an intrastate and interstate basis. *See* 20 C.F.R § 655.154(a). If an employer has satisfied the recruitment assurances and other promises identified in 20 C.F.R. § 655.161, then the Secretary of Labor can grant a request to hire temporary foreign agricultural labor. *See* 8 U.S.C. § 1188. The H-2A regulations require an employer to provide baseline benefits to both domestic and foreign H-2A workers. *See* 20 C.F.R. § 655.122(a). "By requiring that the employer provide these baseline benefits, the regulations ensure that foreign workers will not be appear more attractive to the employer than domestic workers, thus avoiding any adverse effects for domestic workers." *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1285 (11th Cir. 2016) ("*Garcia-Celestino I*").

 "Under the program, employers must submit to the Department of Labor an application commonly referred to as a 'clearance order' detailing the terms and conditions of their prospective workers' employment." *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 898 F.3d 1110, 1116 (11th Cir. 2018) ("*Garcia-Celestino II*"). "By federal regulation, the clearance order becomes the employees' work contract by default if the employer does not draw up a separate contract for them." *Id*. (citing 20 C.F.R. § 655.122(q)).

In this case, WKI used its clearance order to recruit and hire Plaintiffs, and because no separate contract was drawn up, the clearance order served as the work contract between WKI

and Plaintiffs.[2] Under the terms of the clearance order WKI advertised the jobs with an hourly

wage of $9.71 per hour of labor and that rate would have to be paid to all workers who filled the

positions, whether or not the employers ultimately hired domestic or foreign H-2A workers. *See*

20 C.F.R. § 655.122(a).

In this lawsuit, Plaintiffs' basic contention is that Campos and the Defendants, including

the Cervantes Defendants, always intended to exploit the H-2A program to access guest laborers

from Mexico because they believed they would work harder for less money. When it became

apparent that Campos would not be able to provide Mexican workers, he cancelled Plaintiffs'

work contracts under the pretense of a drought.

## II.   PROCEDURAL HISTORY

In addition to the Cervantes Defendants, WKI and Campos entered into farm labor

contracts under the H-2A program with five other farms based in southern New Mexico –

Defendants RJF Farms, Inc. and its owner Ronnie J. Franzoy, Tierra de Dios Farms, LLC, Lack

Farms, Inc., Rio Valley Chili, Inc., and Skyline Produce, LLC. Plaintiffs voluntarily dismissed

claims against RJF Farms, Inc., Ronnie J. Franzoy, Rio Valley Chili, Inc., Lack Farms, Inc., and

Skyline Produce, LLC. *See* ECF. Nos. 71, 146, 158.

As for the Cervantes Defendants, Plaintiffs alleged four causes of action against them for

various statutory violation of the AWPA, fraud, breach of contract, and civil conspiracy. *See*

Pls.' First Am. Comp., ECF. No. 103. In May and July 2016, the Cervantes Defendants moved

---

[2] The Cervantes Defendants contend that the record evidence shows that the clearance order was
given only to four of the nine Plaintiffs. *See* Defs.' Mot. for Summ. J. ¶ K at 5, ECF No. 240.
However, they fail to identify which Plaintiffs allegedly did not receive the clearance order, and
also fail to cite the record. In any case, as explained below, because the Cervantes Defendants
did not jointly employ Plaintiffs they are not liable for breaching the terms of the clearance
order.

for, and the Court granted, summary judgment to the Cervantes Defendants, concluding that no reasonable jury could find them liable to Plaintiffs on those theories of liability.[3]

As for Defendants WKI and Tierra, they never obtained legal counsel as required for entity parties. *See* D.N.M.LR-Civ. 83.7. WKI attempted to answer *pro se* in conjunction with Defendant Jaime Campos, WKI's owner. *See* ECF. No. 55. The Court interpreted that answer as that of Campos', not WKI's. *See* ECF No. 69. On September 3, 2015 the Honorable William P. Lynch, United States Magistrate Judge, entered a Notice of Proposed Entry of Default Judgment, warning Tierra and WKI that unless they "retain counsel and submit answers filed by an attorney by September 25, 2015, [he would] recommend to the District Judge that default judgment be entered against them and in favor of the Plaintiffs." ECF No. 128. Tierra and WKI never heeded that warning, so on October 7, 2015 the Clerk of Court filed the Clerk's Entry of Default Judgment against Tierra and WKI for having failed to plead or otherwise defend. *See* ECF Nos. 135, 136. Plaintiffs never moved for a damages hearing, and no subsequent litigation concerning the Clerk's Entry of Default has occurred since that October 7, 2015 entry. To date, WKI and Tierra have not obtained legal counsel.

Defendant Jaime Campos, *pro se*, also appears to have stopped participating in the litigation. His last docket filing was on October 10, 2015. *See* ECF No. 137. He failed to appear at a status conference before Judge Lynch on March 2, 2016, although he did participate in a mid-March 2016 deposition. *See* ECF Nos. 161, 168.

## III.    STANDARD OF REVIEW

---

[3] At that time the Court did not grant the Cervantes Defendants summary judgment on the instant matter because the Cervantes Defendants did not clearly identify that claim as one for which they sought summary judgment. They broadly moved for summary judgment "as to all claims." But they did not cite § 1822 or advance any legal arguments against that provision. The Court, *sua sponte*, granted the Cervantes Defendants leave to file a motion for summary judgment, which they did two weeks later.

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is considered material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248–50. An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmovant. *See Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015). When "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Cassara v. DAC Serv., Inc*., 276 F.3d 1210, 1212 (10th Cir. 2002). The burden then shifts to the opposing party to come forward with admissible evidence to create a genuine issue of material fact on that element. *See Bacchus Indus., Inc. v. Arvin Indus., Inc*., 939 F.2d 887, 891 (10th Cir. 1991).

## IV.   DISCUSSION

The Court next analyzes whether the Cervantes Defendants and WKI jointly employed Plaintiffs such they are equally liable for WKI's cancellation of their work contracts.

### A.  The AWPA and Joint Employment Principles

In Paragraph 142(b) of Plaintiffs' First Amended Complaint, Plaintiffs sue the Cervantes Defendants under 29 U.S.C. § 1822(c) on the theory that they are liable for WKI's and Campos' last minute cancellation of their work contracts. Section 1822(c) provides that "[n]o farm labor contractor, agricultural employer, … shall, without justification, violate the terms of any working

arrangement made by that contractor, employer, or association with any migrant agricultural worker." Plaintiffs contend that the "working arrangement" at issue was the clearance order that was used to recruit and hire them.

The Cervantes Defendants are liable only if they jointly employed Plaintiffs with WKI. In order "to assure necessary protections for migrant and seasonal agricultural workers," 29 U.S.C. § 1801, the AWPA imposes obligations on "agricultural employers."[4] Under the AWPA, the term agricultural employer means "any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker." *Id*. § 1802(2). If an employer fails to adhere to any of the provisions in the AWPA the statute creates a private right of action in federal court on behalf of all aggrieved persons. *Id*. § 1854(a). The Act empowers district courts to impose actual damages or statutory damages of $500 per plaintiff per violation. *Id*. § 1854(c).

For purposes of the AWPA, the term "employ" has the same definition as that used in the Fair Labor Standards Act. *Id*. § 1802(5). "'Employ' includes to suffer or permit to work." 29 U.S.C. § 203(g). "Under the AWPA, [agricultural employers] who engage the services of farm labor contractors to furnish farmworkers are found to have 'employed' the members of the labor contractors' crews … when the independent farm labor contractor is 'not completely disassociated with respect to the employment' of workers, such that the labor contractor and the grower are deemed to jointly employ the workers." *Fanette v. Steven Davis Farms, LLC*, 28 F. Supp. 3d 1243, 1254 (N.D. Fla. 2014) (citing 29 C.F.R. § 500.20(h)(4)-(5); 29 C.F.R. § 791.2(a)).

---

[4] The Court explained in its previous Order that both of the Cervantes Defendants qualify as agricultural employers under the AWPA. *See* Mem. Op. and Order at n.3 & 23.

Relevant regulations define "joint employment" as "a condition in which a single individual stands in the relation of an employee to two or more persons at the same time." 29 C.F.R. § 500.20(h)(5). Because the use of farm labor contractors is common in agricultural employment, *see Gonzalez-Sanchez v. Int'l Paper Co.*, 346 F.3d 1017, 1020 (11th Cir. 2003), the joint employment doctrine ensures that agricultural employers cannot "shield[] themselves from liability for mistreating employees [b]y hiring (and thereby shifting liability to) intermediary" labor contractors. *See Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 589 (W.D. Tex. 1999). Thus under the AWPA, "agricultural entities [are] directly responsible for farmworkers who, as a matter of economic reality, depend[] upon them, even if the workers were hired or employed by a middleman or independent contractor." *Antenor v. D & S Farms*, 88 F.3d 925, 930 (11th Cir. 1996). "Congress' plain intent was to protect migrant and seasonal workers from abuse and exploitation, and to hold 'agricultural employers' fully accountable as joint employers whenever the facts suggest that liability is fairly imposed." *Id.*

"Whether an entity qualifies as a joint employer is a question of law" for the court to decide. *Garcia-Celestino I*, 843 F.3d at n.12 & 1293. "[T]he ultimate question to be determined" by the court "is the economic reality – whether the worker is so economically dependent upon the agricultural employer/association as to be considered its employee." 29 C.F.R. § 500.20(h)(5)(iii). The court asks "whether the worker's employment with the two entities should be treated as "one employment" for purposes of determining compliance with" and liability under the AWPA. *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 137 (4th Cir. 2017). The "relevant relationship" the court examines is "the relationship between the putative joint employers." *Id.* (explaining that courts should not "improperly focus on the relationship between the employee and the putative joint employer, [but] rather … on the relationship between the

putative joint employers.") If the court determines that "as a matter of economic reality, a laborer is dependent upon the [farm labor contractor] and the agricultural employer, then a joint employment relationship exists, and the laborer will be considered an employee of both entities." *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1208 (11th Cir. 2003). But if the court's analysis shows that two entities "are completely disassociated with respect to the employment of a particular employee, a joint employment situation does not exist." 29 C.F.R. § 500.20(h)(5). In determining the joint employment test, courts look to the following regulatory factors.

(A) Whether the agricultural employer/association has the power, either alone or through control of the farm labor contractor to direct, control, or supervise the worker(s) or the work performed (such control may be either direct or indirect, taking into account the nature of the work performed and a reasonable degree of contract performance oversight and coordination with third parties);

(B) Whether the agricultural employer/association has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker(s);

(C) The degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue;

(D) The extent to which the services rendered by the worker(s) are repetitive, rote tasks requiring skills which are acquired with relatively little training;

(E) Whether the activities performed by the worker(s) are an integral part of the overall business operation of the agricultural employer/association;

(F) Whether the work is performed on the agricultural employer/association's premises, rather than on premises owned or controlled by another business entity; and

(G) Whether the agricultural employer/association undertakes responsibilities in relation to the worker(s) which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

29 C.F.R. § 500.20(h)(5)(iv)(A)-(G). The laborer carries to the burden of proof to establish the joint employment inference by a preponderance of the evidence. *See Martinez-Mendoza*, 340 F.3d at 1209.

## B.  Analysis of Factors

The Court next applies the seven regulatory factors above to determine whether the Cervantes Defendants and Campos jointly employed Plaintiffs.

### i. *Power to Direct, Control, or Supervise, Both Directly and Indirectly*

This factor focuses on whether the putative employer takes an "overly active role" in overseeing the work performed by the workers. *Martinez-Mendoza,* 340 F.3d at 1209-10. "[C]ontrol arises when the alleged employer goes beyond general instructions, such as how many acres to pick in a given day, and begins to assign specific tasks" or workers. *Id*. at 1210. An alleged employer engages in active oversight when it makes such decisions as: (1) whom and how many employees to hire; (2) whom to assign to specific tasks; (3) when work should begin or end each day; (4) when a particular field will be harvested or planted; and (5) whether a worker should be disciplined. *Id.* at 1210; *see also Charles v. Burton*, 169 F.3d 1322, 1329-30 (11th Cir. 1999).

In this case, Plaintiffs never actually worked on the Cervantes Defendants' lands. They therefore rely heavily on the Cervantes Defendants' past employment of a different farm labor contractor, Jesus Maldonado, as a proxy, contending that the Cervantes Defendants exercised substantial control of Maldonado and his work crew, and perforce would have done the same to Campos and Plaintiffs. For instance, Plaintiffs note how Dino Cervantes would instruct Maldonado to provide a specific number of workers to harvest a specific crop at a specific time. *See* Pls.' Resp. 11-12, ECF No. 234. The Cervantes Defendants deducted FICA taxes for

Maldonado's laborers, could alter Maldonado's compensation, and Dino Cervantes monitored Maldonado's laborers' wages. *Id*. Plaintiffs also argue that Maldonado's laborers effectively depended on the contract between the Cervantes Defendants and Maldonado, since they drew their wages from that contract. *Id*.

This evidence concerning Maldonado would powerfully suggest that the Cervantes Defendants exercise control and supervision of farm labor contractors and their crews. But is the Cervantes Defendants' relationship with Maldonado, a non-party to this case, relevant evidence of the relationship between the Cervantes Defendants and WKI? Plaintiffs say so, relying on a single district court opinion, *Rodriguez et al. v. SGLC, Inc.*, 2012 WL 5704403 at *7-8, 2:08-cv-01971-MCE-KJN (E.D. Cali. Nov. 15, 2012). There, as here, a farm labor contractor, SGLC, hired plaintiffs under the H-2A program to work on grower's lands. *Id*. at *1. And there, as here, SGLC did not furnish plaintiffs to work on the grower's lands. Unlike here though, the grower had employed SGLC and its crew in the past. *Id.* at *7. Their business history was relevant evidence. So the plaintiffs relied on that history, noting how the grower would perform quality control over SGLC's crew's work, supervise the crew's members, monitor their timesheets, and dictate whether to pay them an hourly or piece rate. *Id*. at *8. Here, WKI and the Cervantes Defendants had no prior history from which Plaintiffs can extrapolate. Using Maldonado as a stand-in is not relevant evidence of the relationship between WKI and the Cervantes Defendants. The conclusion in *Rodriguez* is not precedential or persuasive.

As between WKI and the Cervantes Defendants, the record construed in Plaintiffs' favor does show the following indicia of control and supervision that the Cervantes Defendants would have exercised: 1) they would have trained Plaintiffs on how to harvest crops; 2) they hired a specific number of laborers to harvest specific fields for a specific duration; and 3) they could

have asked WKI to "replace" a laborer. *See e.g. Charles*, 169 F.3d at 1330 (control found where agricultural determined when, where, and for how long farm labor contractor's crew would pick snap beans).

The main problem, though, is that Plaintiffs never actually worked on the Cervantes Defendants' lands. The Court therefore cannot meaningfully evaluate the degree of supervision and control they would have exercised over Plaintiffs. This is important because whereas an overly active putative employer tilts towards a finding of joint employment, "de minimis supervision," does not. *See Antenor*, 88 F.3d at 935 (internal quotations omitted). The Court cannot asses on which side of the dividing line the Cervantes Defendants stand.

That aside, the next problem Plaintiffs have is that the indicia of control and supervision Plaintiffs cited could well be "agricultural decisions" – that is, "necessary parts of agricultural administration such as choosing which fields to pick on which days or dictating what planting specifications should be used." *Garcia-Celestino II*, 898 F.3d at 1126. Even though such decisions "might indirectly affect how many workers need to be hired," they still do not show 'control[.]'" *Id*. The record as a whole shows that the Cervantes Defendants exercised very little control. WKI alone chose who and how to hire. The Cervantes Defendants were not involved in WKI's internal organization. There is no evidence that the Cervantes Defendants would have decided when Plaintiffs began their work day, took breaks, or finished their work. Plaintiffs have presented no evidence that the Cervantes Defendants would have assigned work to specific workers, inspected the work performed, or would have closely monitored Plaintiffs. *Cf. Torres-Lopez v. May*, 111 F.3d 633, 642-43 (9th Cir. 1997) (grower exercised "significant control" when it controlled harvest schedule, number of workers, decided days for harvesting, inspected work performed, had a daily presence in the field, and monitored the farmworkers closely.)

Plaintiffs argue that the Cervantes Defendants exercised supervision and control over them because Campos testified that he would "have to replace" a worker that the agricultural employer did not want. Dep. of Jaime Campos 71:19, ECF No. 234-2. But Campos' testimony tells a different story. A few lines later he stated that "if someone is not behaving or doing the right job or something, it was for [WKI] first to try to encourage the person to – to comply, to do it," *id.* at 71:24-25 – 72:1-2, suggesting that the Cervantes Defendants would not have directly been involved in the discipline or retention of Plaintiffs. All in all, this factor does not weigh in Plaintiffs' favor.

### ii. *Direct or Indirect Power to Hire or Fire, Modify Employment Conditions, or Determine Rates or Methods of Pay*

In analyzing this factor, courts look at whether the putative employer can make business decisions that impact the worker's conditions of employment, such as determining hiring or firing decisions, the number of hours to be worked each day, and whether the putative employer dictates pay rates and methods. *See Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1179 (11th Cir. 2012). In *Antenor* the putative employers jointly employed the plaintiffs where they exercised "veto" power of the farm labor contractor's hiring decisions, "monitored the workers' job qualifications rather than relying on" the farm labor contractor to do so, and "dictated the workers' hours" by deciding when work should begin, by forcing the workers to stop working, and by bringing in their own work crews at their discretion. 88 F.3d at 935.

The Cervantes Defendants and WKI signed an "Agreement of Outsourcing Support" governing the number of workers and services that the Plaintiffs were to provide to the Cervantes Defendants. *See* Agreement of Outsourcing, ECF No. 234-2, 123 ("AOS"). However, WKI, not the Cervantes Defendants, was responsible for presenting to the Plaintiffs the fully prepared work contract, with job descriptions, pay rates, and methods of payment already specified.

Appendix 975

Plaintiffs contend that the Cervantes Defendants effectively dictated Plaintiffs' wages by deciding to pay them on an hourly, rather than piece rate, basis. However, as Plaintiffs repeatedly acknowledge, the H-2A regulations require the employing entity to pay workers an hourly wage of either the AEWR or the federal minimum hourly wage. And besides, Plaintiffs presented no evidence that the Cervantes Defendants were the ones who chose between a piece-rate or an hourly method of payment. It appears WKI made that decision. So this argument is unavailing.

Plaintiffs also argue that the Cervantes Defendants were able to impact the workers' conditions of employment as evidenced by Dino Cervantes' statement that "if somebody didn't harvest chile to quality standards, I'll tell the contractor that he didn't do a good job." Pls.' Resp. at 13. Plaintiffs argue this meant that the Cervantes Defendants could "vet the quality of work performed." *Id.* But even reading the record in Plaintiffs' favor, this is again the sort of "agricultural decision which does not constitute the type of 'control' that the … [AWPA] address[es]." *Martinez-Mendoza,* 340 F.3d at 1211 (holding that "the drafting of plant specifications is unquestionably an agricultural decision.") An agricultural employer does not jointly employ a farm labor contractor's crew simply because it ensures the crew complies with contract specifications. *See id.* Accordingly, this factor does not weigh in Plaintiffs' favor.

### iii. *Permanency and Duration*

Plaintiffs argue that they were hired for a fixed period, November 2011 to March 2012, and that their work relationship would have been permanent to the extent that their work is inherently seasonal. Indeed, "[h]arvesting of crops is a seasonal industry … [h]owever temporary the relationship may be … the relationship is permanent … [if] the migrants work only for [the] defendants during that season." *Charles*, 169 F.3d at 1332. "Where [a farm labor contractor] and its workers are engaged for the duration of the operation and are obligated work exclusively for

the employer at its discretion, this factor would suggest economic dependence." *Martinez-Mendoza*, 340 F.3d at 1212. Although Plaintiffs were hired to work for a specific harvest period, Plaintiffs presented no record evidence that WKI would have furnished Plaintiffs to work primarily or exclusively with the Cervantes Defendants as opposed to several other farmers WKI also had labor contracts with. Neither the clearance order nor the contract between the Cervantes Defendants and WKI specify such terms. Thus, the evidence suggests that there was little, if any, permanency and duration of the relationship between Plaintiffs and the Cervantes Defendants. So this factor is not in Plaintiffs' favor.

### iv. *Whether the services rendered were repetitive and rote*

"The lower the worker's skill level, the lower the value and marketability of his services, and the greater the likelihood of his economic dependence on the person utilizing those services." *Martinez-Mendoza*, 340 F.3d at 1212. Whether Plaintiffs would harvest crops or process and pack dry chile for the Cervantes Defendants, either activity is likely a repetitive and rote task. *See Charles*, 340 F.3d at 1332 (picking snap beans was a "repetitive and rote task requiring relatively little training.") This factor weighs in favor of finding of joint employment.

### v. *Integral part of the overall business operation*

"This factor is probative of joint employment because a worker who performs a routine task that is a normal and integral phase of the grower's production is likely to be dependent on the grower's overall production process." *Charles*, 169 F.3d at 1332 (internal quotations and citations omitted). Plaintiffs claim that they would have harvested red chile for the Cervantes Defendants and that harvesting chile is an integral part of the Cervantes Defendants' operations. As support Plaintiffs cite an interrogatory showing that Cervantes Agribusiness produces cotton,

corn, chile, and pecans, and they cite Dino Cervantes' statement that the Cervantes family has been in agriculture for multiple generations. *See* Pls' Resp. at 15.

The Cervantes Defendants challenge Plaintiffs' assertion that harvesting chile is an integral part of their operations, saying that chile is one of numerous crops they produce. Cervantes Enterprises also contends that it is not involved in chile harvesting at all. But reading the record in Plaintiffs' favor, as the Court must, the evidence shows that harvesting chile is an integral part of the Cervantes Defendants' operations. Dino Cervantes, Cervantes Agribusiness' general manager, explained that he is "involved in the chile industry," that his various family members "are involved at different capacities and different aspects of the chile industry," that agriculture is a family vocation "and chile is part of that." Dep. of Dino Cervantes, cited by Plaintiffs as "SJR 27:13-23", ECF No. 234-2 at 27.

This evidence suggests that Cervantes Enterprises is in the "chile industry" even if it not the entity overseeing harvesting operations. Cervantes Agribusiness appears to have played that role. Testimony from Dino Cervantes and his farm labor contractor Jesus Maldonado suggests that Cervantes Agribusiness relied greatly on the work of manual field laborers. *See id.* cited by Plaintiffs as SJR 28:9:15; Dep. of Jesus Maldonado, cited by Plaintiffs as SJR 34:1-25 – 35:1-25, ECF No. 234-2 at 34-45. *Cf. Martinez-Mendoza*, 340 F.3d at 1213 (hand-planting of seedlings was not "indispensable" work because forests naturally regenerate and because most of defendant's seedlings were machine-planted). Plaintiffs' evidence sufficiently demonstrates that chile harvesting was an integral part of the Cervantes Defendants' overall operations.

The Cervantes Defendants also dispute that Plaintiffs would have worked for them specifically as opposed to other farmers. True, the contract between WKI and the Cervantes Defendants called for a generic "15 farm workers." *See* AOS. It did not specifically identify

Plaintiffs. But the fact remains that those 15 workers would have harvested crops on the Cervantes Defendants' premises, and that the performance of this task would have been integral to the Cervantes Defendants' overall operations. So this factor weighs in Plaintiffs' favor.

### vi. *Work performed on the agricultural employer's premises*

The Cervantes Defendants concede that Plaintiffs would have worked on their lands. However, when the court in analyzed this factor in *Martinez-Mendoza* it suggested that workers who are unaware of the putative employer's identity are not jointly employed by that employer. 340 F.3d at 1214. The plaintiffs' farm labor contractor hired and transferred them to work in forests owned by different landowners, so the plaintiffs never knew on whose land they worked. *Id.* They did not "rel[y] upon or anticipate[]" the putative employer's business a source of income. *Id.* However, because the plaintiffs did actually work on the defendant's forest land, the court found this factor in plaintiffs' favor, but only "slightly." *Id*. Here, Plaintiffs likewise never knew they would work for the Cervantes Defendants or on their lands. And as mentioned earlier, Plaintiffs presented no record evidence that WKI would have furnished Plaintiffs to work primarily or exclusively with the Cervantes Defendants as opposed to several other farmers WKI also had labor contracts with. This factor may weigh in Plaintiffs' favor, but as in *Martinez-Mendoza*, only slightly.

### vii. *Responsibilities ordinary performed by employers*

"The final factor examines whether [the putative employer] undertook responsibilities for workers often undertaken by employers, such as (1) preparing and/or making payroll records, (2) preparing and/or issuing pay checks, (3) paying FICA taxes, (4) providing workers' compensation insurance, (5) providing field sanitation facilities, housing or transportation, or (6) providing tools and equipment or materials required for the job." *Martinez-Mendoza*, 340 F.3d at

1214. "The provision of such services "is both an objective manifestation of employer status and strong evidence of the workers' economic dependence upon [it]." *Id*. Thus in *Martinez-Mendoza*, the court found that this factor did not suggest joint employment when the putative employer "provided none of these services[.]" *Id*. "The [farm labor contractor] alone prepared the laborer's payroll records and checks, paid their FICA taxes, provided their housing, transportation, tools, etc." *Id*.

Plaintiffs submitted no evidence that the Cervantes Defendants undertook responsibilities commonly performed by employers. There is no evidence that the Cervantes Defendants would have managed Plaintiffs' payroll, provide workers' compensation insurance, provide field sanitation facilities, or provide house or transportation. The clearance order identified WKI alone as the employer. According to the clearance order, WKI was to provide workers three meals a day at specified cost, housing, transportation, and minimum work hours. WKI was responsible for deducting FICA and state taxes. The clearance order offered unemployment insurance, workers' compensation insurance, and tools at no charge. There is simply no indication in the record that the Cervantes Defendants were responsible for any of these services. This factor does not weigh in Plaintiffs' favor.

### C. Weighing of Factors

Of the seven regulatory factors, only three weigh in Plaintiffs' favor (and one of them only slightly.) Again, in analyzing whether the Cervantes Defendants jointly employed Plaintiffs, "the ultimate question to be determined is the economic reality – whether the worker is so economically dependent upon the agricultural employer/association as to be considered its employee." 29 C.F.R. § 500.20(h)(5)(iii). The answer is no, because there is little to no evidence that the Cervantes Defendants would have directly impacted Plaintiffs' employment,

performance, controlled their qualifications, payment, and the like. Plaintiffs were unaware of the Cervantes Defendants' existence. WKI, not the Cervantes Defendants, signed itself up to do employer-like things such as pay Plaintiffs and deduct their taxes. WKI was to furnish them meals, housing, and transportation. When weighed together the factors strongly show that the Cervantes Defendants did not jointly employ Plaintiffs with WKI. They are not liable for WKI's breach of any working arrangement under 29 U.S.C. § 1822(c).

**IT IS THEREFORE ORDERED that** Cervantes Agribusiness' and Cervantes Enterprises Inc.'s Joint Motion for Summary Judgment **[ECF No. 233]** is **GRANTED**. Those parties are hereby **DISMISSED**.

**IT IS SO ORDERED**.

_____
UNITED STATES DISCTRICT COURT JUDGE

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

ESTEBAN ALFARO-HUITRON, *et al.*,

     Plaintiffs,

v.                                              Civ. No. 15-210 GJF/JHR

JAIME CAMPOS, *et al.*,

     Defendants.

## FINAL JUDGMENT

     In accordance with Federal Rule of Civil Procedure 58(a) and consistent with the "Order

Granting Stipulation of Dismissal" [ECF 293] entered by the Court on May 6, 2019, this Final

Judgment is entered and the above-captioned cause is **DISMISSED WITH PREJUDICE**.

     **IT IS SO ORDERED**.


THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*